THE STATE OF OHIO, APPELLEE, *v.* JENKINS, APPELLANT.

[Cite as State *v.* Jenkins (1984), 15 Ohio St. 3d 164.]

(No. 84-478—Decided December 17, 1984.)

166

*Mr. John T. Corrigan,* prosecuting attorney, *Mr. George J. Sadd* and *Mr. Thomas Marotta,* for appellee.

*Mr. Hyman Friedman,* county public defender, and *Ms. Marillyn Fagan Damelio,* for appellant.

*Mr. Bruce Campbell* and *Ms. Gail White,* urging reversal for *amicus curiae,* American Civil Liberties Union.

*Mr. Randall M. Dana,* public defender, *Mr. David C. Stebbins* and *Ms. Elizabeth Manton,* urging reversal for *amicus curiae,* Ohio Public Defender Commission.

CELEBREZZE, C.J. Today we review for the first time a conviction and death sentence subsequent to the reenactment of the death penalty in Ohio. See R.C. 2929.03 *et seq.* For the reasons to follow, we hold the death penalty statutes to be constitutional and, in this case, to have been applied in a constitutional manner. We further affirm appellant's conviction and hold that the death sentence in the case at bar is proper.

I

At the outset, we direct our attention to appellant's arguments that in spite of the overhaul undertaken by the General Assembly subsequent to the decision of the United States Supreme Court in *Lockett* v. *Ohio* (1978), 438 U.S. 586 [9 O.O.3d 26], the Ohio death penalty scheme is both unconstitutional on its face and as applied to appellant in this case in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10 and 16, Article I of the Ohio Constitution.

Appellant first challenges the imposition of the death penalty on the

basis that where a right as fundamental as life is at stake, a state must employ the least restrictive means possible to achieve a compelling interest. Appellant contends that the societal interests at stake in the present case include deterrence and incapacitation which, according to appellant, can be adequately protected with a less restrictive approach than the imposition of death, *i.e.*, life imprisonment.

Appellant's "least restrictive" argument, however, was rejected over eight years ago when the United States Supreme Court released its decisions in *Gregg* v. *Georgia* (1976), 428 U.S. 153; *Proffitt* v. *Florida* (1976), 428 U.S. 242; *Jurek* v. *Texas* (1976), 428 U.S. 262; *Woodson* v. *North Carolina* (1976), 428 U.S. 280; and *Roberts* v. *Louisiana* (1976), 428 U.S. 325.

In *Gregg, supra,* the court stated that "* * * the decision that capital punishment may be the appropriate sanction in extreme cases is an expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death."[3] The Supreme Court stated that the death penalty "* * * is an extreme sanction, suitable to the most extreme of crimes."[4] Appellant's argument is predicated upon societal protection, while the Supreme Court, has recognized that the death penalty, as a sanction or punishment, is proper in extreme cases.

Alternatively, appellant argues that the death penalty violates the prohibition under the Eighth Amendment against cruel and unusual punishment and is therefore *per se* unconstitutional. We disagree. Clearly, any vitality which this argument may have had at the time of *Furman* v. *Georgia* (1972), 408 U.S. 238, was rejected in *Gregg* and its companion cases when the high court stated:

"We hold that the death penalty is not a form of punishment that may never be imposed, regardless of the circumstances of the offense, regardless of the character of the offender, and regardless of the procedure followed in reaching the decision to impose it."[5]

Moreover, since the decision in *Gregg,* the recurring theme has been that states may constitutionally impose the sentence of death as long as the discretion of the sentencing authority is "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action" in imposing the sentence. *Zant* v. *Stephens* (1983), ___ U.S. ___, 77 L.Ed. 2d 235, at 248. The Supreme Court has stressed the necessity of "genuinely narrow[ing] the class of persons eligible for the death penalty," *id.* at 249, while requiring the capital sentencing procedure guide and focus "the jury's objective consideration of the particularized circumstances of the in-

---

[3] *Gregg* v. *Georgia,* at 184.

[4] *Id.* at 187.

[5] *Id.*

dividual offense and the individual offender before it can impose a sentence of death." *Jurek, supra,* at 273-274. With these principles in mind, appellant's argument, which requests the erection of a *per se* rule against the death penalty, must be rejected.

Appellant maintains, however, that the death penalty is applied in an arbitrary and capricious fashion since in administering capital statutory schemes prosecutors will inevitably exercise a certain degree of discretion. A similar argument was considered and rejected by both the majority and concurring opinions in *Gregg.*

Justice Stewart, writing for the court, addressed the argument at 199 as follows:

"First, the petitioner focuses on the opportunities for discretionary action that are inherent in the processing of any murder case under Georgia law. He notes that the state prosecutor has unfettered authority to select those persons whom he wishes to prosecute for a capital offense and to plea bargain with them. Further, at the trial the jury may choose to convict a defendant of a lesser included offense rather than find him guilty of a crime punishable by death, even if the evidence would support a capital verdict. And finally, a defendant who is convicted and sentenced to die may have his sentence commuted by the Governor of the State and the Georgia Board of Pardons and Paroles.

"The existence of these discretionary stages is not determinative of the issues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. *Furman,* in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution. * * *"

In his concurring opinion, Justice White, joined by Chief Justice Burger and Justice Rehnquist, discussed the allegation of the exercise of arbitrary and capricious prosecutorial discretion as follows:

"Petitioner's argument that prosecutors behave in a standardless fashion in deciding which cases to try as capital felonies is unsupported by any facts. Petitioner simply asserts that since prosecutors have the power not to charge capital felonies they will exercise that power in a standardless fashion. This is untenable. Absent facts to the contrary, it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts. Unless prosecutors are incompetent in their judgments, the standards by which they decide whether to charge a capital felony will be the same as those by which the jury will decide the questions of guilt and sentence. Thus defendants will escape the death penalty through prosecutorial charging decisions only because the offense is not sufficiently serious; or because the proof is in-

sufficiently strong. This does not cause the system to be standardless any more than the jury's decision to impose life imprisonment on a defendant whose crime is deemed insufficiently serious or its decision to acquit someone who is probably guilty but whose guilt is not established beyond a reasonable doubt. Thus the prosecutor's charging decisions are unlikely to have removed from the sample of cases considered by the Georgia Supreme Court any which are truly 'similar.' If the cases really were 'similar' in relevant respects, it is unlikely that prosecutors would fail to prosecute them as capital cases; and I am unwilling to assume the contrary." *Id.* at 225.

Moreover, as recognized by Justice White in his concurring opinion in *Gregg,* appellant's argument represents an indictment of our entire criminal justice system which must be constitutionally rejected. *Id.* at 226.

Next, appellant contends the Ohio death penalty scheme is unconstitutional for failing to require premeditation or deliberation as the culpable mental state for defendants in all capital cases.[6] Specifically, appellant relies upon the concurring opinion of Justice White in *Lockett* v. *Ohio, supra,* at 621, wherein the view was expressed that the imposition of the death penalty upon one who did not possess at least a purpose "to cause the death of the victim" would likely violate the prohibition contained in the Eighth Amendment against cruel and unusual punishment.[7]

In *Edmund* v. *Florida* (1982), 458 U.S. 782, Justice White, writing for the majority, concluded that imposition of the death sentence upon an individual who aids or abets a felony but who does not kill, attempt to kill or intend to kill, violates the Eighth Amendment. In that decision, the high court favorably cited a number of state statutes, including R.C. 2903.01(B), (C) and (D), as well as R.C. 2929.02(A) and 2929.04(A)(7), which preclude the imposition of a death sentence unless the defendant is specifically found to have intended to cause the death of another by proof beyond a reasonable doubt. *Id.* at 790, fn. 7.

Contrary to appellant's contention, the Eighth Amendment does not require that in order to be subject to a death sentence, the defendant must have committed the murder with prior calculation and design. Cf. *Ed-*

---

[6] R.C. 2903.01 provides, in relevant part:

"(A) No person shall purposely, and with prior calculation and design, cause the death of another.

"(B) No person shall purposely cause the death of another while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson or arson, aggravated robbery or robbery, aggravated burglary or burglary, or escape.

"(C) Whoever violates this section is guilty of aggravated murder, and shall be punished as provided in section 2929.02 of the Revised Code.

"(D) No person shall be convicted of aggravated murder unless he is specifically found to have intended to cause the death of another. * * *"

[7] 438 U.S. 586, at 624.

*mund, supra.* Instead, the culpable mental state which must be proven in Ohio, consistent with Eighth Amendment protections, is that the defendant specifically intended to cause the death of another. Accordingly, we find appellant's contention to be without merit.

Without citation to legal authority, appellant further argues that the death penalty in Ohio is constitutionally defective since the state is not required to prove the absence of any of the mitigating factors. Simply stated, this argument represents an attempt by appellant to have this court impose upon the state a burden not required under either the Ohio or United States Constitutions. The concept of weighing aggravating circumstances proved beyond a reasonable doubt against any existing mitigating factors was approved in *Proffitt,* and its vitality continues today. See *Barclay* v. *Florida* (1983), ___ U.S. ___, 77 L.Ed. 2d 1134.

Appellant also contends his death sentence should be set aside for the reason that R.C. Chapter 2929 fails to explicitly identify whether the defendant bears the burden of proving the existence of mitigating factors, and what standard of proof must be utilized in determining their presence. We disagree. An examination of the pertinent statutory provisions which address the subject of mitigating factors demonstrates that the statute does indeed provide the direction that appellant claims is lacking.

For example, R.C. 2929.03(D)(1) provides, in pertinent part:

"The defendant shall have the burden of going forward with the evidence of any factors in mitigation of the imposition of the sentence of death. The prosecution shall have the burden of proving, by proof beyond a reasonable doubt, that the aggravating circumstances the defendant was found guilty of committing are sufficient to outweigh the factors in mitigation of the imposition of the sentence of death."

This statutory section unambiguously answers appellant's charge as to who bears the burden of proving the existence of mitigating circumstances, by specifically placing the burden on the defendant to go forward with evidence of mitigation. The question remains, however, as to what standard of proof applies to mitigating factors.

Although the standard is not readily apparent from a reading of R.C. 2929.03 or 2929.04, the Committee Comment to the former R.C. 2929.03[8] resolves any uncertainty. Therein, it is stated that "* * * [m]itigation must be established by a preponderance of the evidence, and the rules of evidence also apply in this phase of the trial [except that] (the requirement for a pre-sentence investigation and report, the requirement for a psychiatric examination and report, and the provision for an unsworn statement by the defendant, represent partial exceptions to the rules of evidence)."

In the present case, the trial court placed the burden of proving mitigating factors by a preponderance of the evidence upon appellant.

---

[8] 134 Ohio Laws, Part II, 1866, 1978-1981.

Thereafter, the state carried the burden of proving by proof beyond a reasonable doubt that the aggravating circumstances appellant was found guilty of committing outweighed the mitigating factors. Since the trial court correctly interpreted the standards governing the burden of proving mitigating factors and by what degree, we are unable to find merit in this assignment of error.

. Appellant next maintains that the imposition of the death penalty under Ohio's statutory structure is constitutionally infirm for failing to provide necessary and adequate guidance to the sentencing authority in relation to "weighing" aggravating circumstances and mitigating factors.

R.C. 2929.03(D)(2) provides in relevant part:

"Upon consideration of the relevant evidence raised at trial, the testimony, other evidence, statement of the offender, arguments of counsel, and, if applicable, the reports submitted pursuant to division (D)(1) of this section, the trial jury, if the offender was tried by a jury, shall determine whether the aggravating circumstances the offender was found guilty of committing are sufficient to outweigh the mitigating factors present in the case. If the jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender. Absent such a finding, the jury shall recommend that the offender be sentenced to life imprisonment with parole eligibility after serving twenty full years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment."[9]

Specifically, appellant focuses upon that portion of R.C. 2929.03(D)(2) which requires that the jury weigh aggravating circumstances against mitigating factors which are present in the case, arguing that the "weighing" process is an inarticulate and amorphous standard which deprived him of his Eighth Amendment protections due to the absence of a discernible legal standard. According to appellant, the constitutional defect arises because the sentencing authority receives no guidance in measuring such disparate factors as aggravating circumstances and mitigating factors beyond the term "weigh."

Appellant's argument is not novel. In *Proffitt, supra,* at 248, the

---

[9] The trial court at the sentencing phase charged the jury as follows:

"Outweigh. To outweigh means to weigh more than, to be more important than. The existence of mitigating factors does not preclude or prevent the death sentence if the aggravating circumstances outweigh the mitigating factors.

"It is the quality of the evidence that must be given primary consideration by you. The quality of the evidence may or may not be commensurate with the quantity of the evidence, that is, the number of witnesses or exhibits presented in this case.

"* * *

"If all twelve members of the jury find, by proof beyond a reasonable doubt, that the aggravating circumstances which Leonard Jenkins was found guilty of committing outweigh the mitigating factors, then you must return such finding to the Court."

Florida statute directed that the jury consider " '* * * [w]hether sufficient mitigating circumstances exist * * * which outweigh the aggravating circumstances found to exist; and * * * [b]ased on these considerations, whether the defendant should be sentenced to life imprisonment or death.' [Fla. Stat. Ann. Sections 921.141(2)(b) and (c) (1976-1977 Supp.)] * * *." In his argument before the Supreme Court the petitioner maintained that the weighing process was an inarticulate standard, making it impossible for the sentencing authority to rationally determine whether, in a given case, aggravating circumstances outweigh the mitigating factors.

In upholding the Florida standard, the court reasoned as follows:

"While these questions and decisions may be hard, they require no more line drawing than is commonly required of a factfinder in a lawsuit. For example, juries have traditionally evaluated the validity of defenses such as insanity or reduced capacity, both of which involve the same considerations as some of the above-mentioned mitigating circumstances. While the various factors to be considered by the sentencing authorities do not have numerical weights assigned to them, the requirements of *Furman* are satisfied when the sentencing authority's discretion is guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition.

"The directions given to judge and jury by the Florida statute are sufficiently clear and precise to enable the various aggravating circumstances to be weighed against the mitigating ones. As a result, the trial court's sentencing discretion is guided and channeled by a system that focuses on the circumstances of each individual homicide and individual defendant in deciding whether the death penalty is to be imposed." *Id.* at 257-258.

In view of the foregoing, we are constrained to reject appellant's argument that by requiring sentencing authorities to "weigh" aggravating circumstances against mitigating factors, the General Assembly somehow failed to limit the sentencing authority's discretion and focus its attention upon the circumstances of the capital offense and the individual offender when considering whether to return a verdict imposing the death penalty.[10]

Appellant next maintains that by requiring proof of aggravating circumstances at the guilt phase of the trial, rather than at the sentencing phase, Ohio has effectively prohibited individualized sentencing required under post-*Furman* cases.[11] In support of this contention, appellant

---

[10] The concept of "weighing" aggravating circumstances and mitigating factors as contained under R.C. 2929.03(D)(2) was approved in *Gregg,* wherein the court cited with approval the suggestion in the Model Penal Code that aggravating circumstances and mitigating factors "should be weighed *and weighed against each other.*" (Emphasis *sic.*) *Id.* at 193.

[11] Appellant also submits that since the same jury which convicted him also sentenced him, he was denied a fair and impartial jury as guaranteed by the Sixth and Fourteenth

directs our attention to the Georgia and Florida statutes at issue in *Gregg* and *Proffitt,* where under each statute the determination of guilt is separated from the consideration of aggravating circumstances.

In considering this contention, it is important to keep in mind the following principle stressed in *Gregg, supra,* at 195:

"We do not intend to suggest that only the above-described procedures would be permissible under *Furman* or that any sentencing system constructed along these general lines would inevitably satisfy the concerns of *Furman,* for each distinct system must be examined on an individual basis."

Thus, although Ohio's capital scheme does differ from those under consideration in *Gregg* and *Proffitt* insofar as when aggravating circumstances are considered in a capital case, this difference does not, in and of itself, render the Ohio scheme unconstitutional. On the contrary, in *Jurek* the high court upheld the Texas death penalty statute which, like Ohio's, requires the jury to consider *at the guilt phase* whether the crime falls into a particular category justifying capital punishment.[12]

In comparing the Georgia and Florida statutes with the Texas statute the court observed that "[e]ach [statute] requires the sentencing authority to focus on the particularized nature of the crime." *Id.* at 271. Equally important was the court's lack of concern for whether aggravating circumstances are proven at the guilt or sentencing phase, as long as at the sentencing phase the jury is allowed to consider factors in mitigation of the imposition of a death sentence. *Id.*

The system currently in place in Ohio does require the sentencing authority to focus on the particular nature of the crime as well as allow the accused to present a broad range of specified and nonspecified factors in mitigation of the imposition of a death sentence. Thus, we are unable to agree with appellant's contention that the consideration of aggravating circumstances at the guilt stage of his trial was constitutionally prohibited.

In his next contention appellant focuses upon the requirements of R.C.

---

Amendments to the United States Constitution, as well as Sections 10 and 16, Article I of the Ohio Constitution. Appellant illustrates this contention by arguing that if defense counsel pursues a defense at the guilt phase of a capital trial which affects defendant's credibility, then his credibility is diminished at the sentencing stage. Suffice it to say that although the Supreme Court has endorsed bifurcated proceedings in death penalty cases, see *Zant* v. *Stephens, supra,* at 248, the court has yet to even remotely suggest that the Constitution requires a new jury be\selected for the sentencing phase. Accordingly, we are unable to accept appellant's contention.

[12] Although the statute under consideration in *Jurek* did not set forth a list of aggravating circumstances *per se,* it did narrow the categories of murder for which the death penalty could be imposed to such an extent that the Supreme Court concluded the categories served much the same purpose as do aggravating circumstances.

2929.021,[13] 2929.03[14] and 2929.05,[15] arguing that the extent of proportionality review in Ohio is constitutionally infirm. In the main, appellant contends that proportionality review in Ohio is flawed since there is no re-

[13] R.C. 2929.021 provides:

"(A) If an indictment or a count in an indictment charges the defendant with aggravated murder and contains one or more specifications of aggravating circumstances listed in division (A) of section 2929.04 of the Revised Code, the clerk of the court in which the indictment is filed, within fifteen days after the day on which it is filed, shall file a notice with the supreme court indicating that the indictment was filed. The notice shall be in the form prescribed by the clerk of the supreme court and shall contain, for each charge of aggravated murder with a specification, at least the following information pertaining to the charge:

"(1) The name of the person charged in the indictment or count in the indictment with aggravated murder with a specification;

"(2) The docket number or numbers of the case or cases arising out of the charge, if available;

"(3) The court in which the case or cases will be heard;

"(4) The date on which the indictment was filed.

"(B) If the indictment or a count in an indictment charges the defendant with aggravated murder and contains one or more specifications of aggravating circumstances listed in division (A) of section 2929.04 of the Revised Code and if the defendant pleads guilty or no contest to any offense in the case or if the indictment or any count in the indictment is dismissed, the clerk of the court in which the plea is entered or the indictment or count is dismissed shall file a notice with the supreme court indicating what action was taken in the case. The notice shall be filed within fifteen days after the plea is entered or the indictment or count is dismissed, shall be in the form prescribed by the clerk of the supreme court, and shall contain at least the following information:

"(1) The name of the person who entered the guilty or no contest plea or who is named in the indictment or count that is dismissed;

"(2) The docket numbers of the cases in which the guilty or no contest plea is entered or in which the indictment or count is dismissed;

"(3) The sentence imposed on the offender in each case."

[14] R.C. 2929.03(D)(2) provides in relevant part:

"Upon consideration of the relevant evidence raised at trial, the testimony, other evidence, statement of the offender, arguments of counsel, and, if applicable, the reports submitted pursuant to division (D)(1) of this section, the trial jury, if the offender was tried by a jury, shall determine whether the aggravating circumstances the offender was found guilty of committing are sufficient to outweigh the mitigating factors present in the case. If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender. Absent such a finding, the jury shall recommend that the offender be sentenced to life imprisonment with parole eligibility after serving twenty full years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment.

"If the trial jury recommends that the offender be sentenced to life imprisonment with parole eligibility after serving twenty full years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment, the court shall impose the sentence recommended by the jury upon the offender. If the trial jury recommends that the sentence of death be imposed upon the offender, the court shall proceed to impose sentence pursuant to division (D)(3) of this section."

[15] R.C. 2929.05 pertinently provides:

"* * * In determining whether the sentence of death is appropriate, the court of appeals

quirement for a jury, when recommending a sentence of life imprisonment over the imposition of the death penalty, to identify the existence of mitigating factors and why those factors outweigh the aggravating circumstances.

We first observe that appellant's argument that proportionality review is constitutionally required is without merit. In *Pulley* v. *Harris* (1984), ___ U.S. ___, 79 L. Ed. 2d 29, the Supreme Court held that neither *Gregg*, *Proffitt* nor *Jurek* established proportionality review as a constitutional requirement. *Id.* at 39. In reaching this conclusion, the court reasoned as follows:

"Needless to say, that some schemes providing proportionality review are constitutional does not mean that such review is indispensable. We take statutes as we find them. To endorse the statute as a whole is not to say that anything different is unacceptable. As was said in *Gregg*, '[w]e do not intend to suggest that only the above-described procedures would be permissible under *Furman* or that any sentencing system constructed along these general lines would inevitably satisfy the concerns of *Furman*, for each distinct system must be examined on an individual basis.' 428 U.S., at 195 * * *. Examination of our 1976 cases makes clear that they do not establish proportionality review as a constitutional requirement."[16]

Thus, although viewed as commendable, the decision in *Pulley* demonstrates that proportionality review is not constitutionally required in every case. Other factors which minimize the risk of arbitrary and capricious sentencing include bifurcated proceedings, the limited number of chargeable capital crimes, the requirement that at least one aggravating circumstance be found to exist and the consideration of a broad range of mitigating circumstances. In conjunction with prior United States Supreme Court decisions, the General Assembly incorporated the aforementioned factors into Ohio's death penalty statutes, as well as providing proportionality review — a meaningful function which reduces the arbitrary and capricious imposition of death sentences.

The question remains whether the absence of a requirement that juries specify the mitigating factors which they found to exist, and why these factors outweigh aggravating circumstances, creates a fatal defect in the statutes. We hold that it does not.

The fundamental purpose behind proportionality review is to ensure that sentencing authorities do not retreat to the pre-*Furman* era when sentences were imposed arbitrarily, capriciously and indiscriminately. To achieve this result, state courts traditionally compare the overall course of conduct for which a capital crime has been charged with similar courses of

---

and the supreme court shall consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases. * * *"

[16] 79 L. Ed. 2d 29, 37.

conduct and the penalties inflicted in comparable cases. See *Gregg* at 204-206, and *Proffitt* at 259-260.

The system currently in place in Ohio enables this court to obtain a vast quantity of information with which to effectuate proportionality review, beginning with data pertinent to *all* capital indictments and concluding with the sentence imposed on the defendant, whether or not a plea is entered, the indictment dismissed or a verdict is imposed by the sentencing authority. See R.C. 2929.021, *supra,* at fn. 13. Although appellant would have this court require juries returning a life sentence to specify which mitigating factors were found to exist and why they outweigh aggravating circumstances, we conclude that such information is not an indispensable ingredient in assisting us to determine whether the imposition of a death sentence is disproportionate to sentences imposed for similarly proscribed courses of conduct.

Appellant further asserts that R.C. 2929.03 and 2929.04 are unconstitutional for treating felony murders in a different manner than premeditated murders. According to appellant, a principal in a felony murder is treated more harshly than a defendant charged with a premeditated murder, since a felony murder constitutes one of the eight aggravating circumstances under R.C. 2929.04, while premeditation is not set forth as an aggravating circumstance. Stated otherwise, appellant argues that aggravating factors for felony murders simply duplicate an element of the offense while a murder by prior calculation and design requires proof of a separate aggravating circumstance in order to justify a death sentence. As such, appellant argues that a single act should not both convict and aggravate.

Assuming, *arguendo,* that the elements set forth under R.C. 2929.04(A)(7) are identical to those set forth under R.C. 2903.01(B),[17] we need only review the Texas statute at issue in *Jurek* to determine whether such a practice is constitutionally proscribed.

The Texas statute under consideration in *Jurek* did not set forth a category of statutory aggravating circumstances which, if proven, would justify the imposition of the death penalty. Instead, the Texas system set forth five classes of murders the existence of any one of which would justify the imposition of a death sentence. The high court took notice of the fact that the five classes of murder set forth in the Texas statute en-

---

[17] It is noteworthy that R.C. 2903.01(B) and 2929.04(A)(7) are not identical. First, crimes such as robbery, arson and burglary, contained under R.C. 2903.01(B), are noticeably absent from R.C. 2929.04(A)(7). More importantly, while a conviction under R.C. 2903.01(B) cannot be sustained unless the defendant is found to have intended to cause the death of another, the state, in order to prevail upon an aggravating circumstance under R.C. 2929.04(A)(7), must additionally prove that the offender was the principal offender in the commission of the aggravated murder or, if the offender was not the principal offender, that the aggravated murder was committed with prior calculation and design.

compassed the separate aggravating circumstances set forth in the Georgia and Florida statutes under consideration in *Gregg* and *Proffitt.*

In sustaining the Texas statute, wherein the conduct which convicts also aggravates, the court stated:

"* * * So far as consideration of aggravating circumstances is concerned, therefore, the principal difference between Texas and the other two States is that the death penalty is an available sentencing option — even potentially — for a smaller class of murderers in Texas. Otherwise the statutes are similar. Each requires the sentencing authority to focus on the particularized nature of the crime." *Jurek, supra,* at 271.

Applying *Jurek* to the arguments raised by appellant in the present case demonstrates that even if we were to construe the aggravated conduct of felony murder set forth within R.C. 2903.01(B) as functionally equivalent to the aggravating circumstance under R.C. 2929.04(A)(7), no constitutional infirmities would arise. On the contrary, any duplication is the result of the General Assembly having set forth in detail when a murder in the course of a felony rises to the level of a capital offense, thus, in effect, narrowing the class of homicides in Ohio for which the death penalty becomes available as a sentencing option.

Under his final contention, appellant maintains that the sentencing scheme in Ohio falls below constitutional standards by failing to afford the sentencing authority the option to impose a life sentence of imprisonment or to grant mercy, regardless of whether aggravating circumstances outweigh mitigating factors. In support of this contention, appellant focuses upon both the Florida and Georgia statutes which, as discussed by Justice Stevens in his concurrence in *Barclay* v. *Florida, supra,* at 1149, authorize the sentencing authority to grant life imprisonment even where the defendant has crossed the statutory threshold and could be subjected to death.

Appellant seizes upon the following language of Justice Stevens' concurrence, arguing that the sentencing authority must be given an opportunity to find the death penalty inappropriate when "statutory aggravating circumstances exist, and arguably outweigh statutory mitigating circumstances, but they are insufficiently weighty to support the ultimate sentence * * *." *Id.* at 1153. As Justice Stevens noted, however, immediately following the above-described passage, is that a second category exists under the Florida scheme where "even though *statutory* mitigating circumstances do not outweigh statutory aggravating circumstances, the addition of nonstatutory mitigating circumstances tips the scales in favor of life imprisonment." (Emphasis *sic.*) *Id.*

Under R.C. 2929.04(B)(7) and (C), defendants are given great latitude in the presentation of *any* relevant factors in mitigation of the imposition of a death sentence. Accordingly, even if states were constitutionally required to adopt one of the two methods described by Justice Stevens in his concurrence in *Barclay,* Ohio's system presently coincides with the second

category by requiring the sentencing authority to consider and weigh against aggravating circumstances any relevant mitigating factors which the defendant presents.

In conclusion, we hold that Ohio's statutory framework for imposition of capital punishment, as adopted by the General Assembly effective October 19, 1981, and in the context of the arguments raised herein, does not violate the Eighth and Fourteenth Amendments to the United States Constitution or any provision of the Ohio Constitution.

## II

Appellant next argues that he was denied his right to a fair trial by an impartial jury when the trial court excused four jurors for cause under the authority of *Witherspoon* v. *Illinois* (1968), 391 U.S. 510 [46 O.O.2d 368], and its progeny. Appellant further argues that the so-called death qualification process of a jury prior to the guilt phase of a capital prosecution is a *per se* violation of an accused's Sixth and Fourteenth Amendment rights since the death-qualified jury is claimed to be predisposed to convict.

In *Witherspoon* v. *Illinois, supra,* at 522, the United States Supreme Court held "that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction."[18] The rationale of the *Witherspoon* decision was that the exclusion of prospective jurors who voiced general objections to the death penalty produced a jury "uncommonly willing to condemn a man to die." *Id.* at 521. Specifically, however, the Supreme Court stated:

"* * * [N]othing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*" (Emphasis *sic.*) *Id.* at 522-523, fn. 21.

R.C. 2945.25 provides in part that:

"A person called as a juror in a criminal case may be challenged for the following causes:

"* * *

"(C) In the trial of a capital offense, that he unequivocally states that under no circumstances will he follow the instruction of a trial judge and consider fairly the imposition of a sentence of death in a particular case. A prospective juror's conscientious or religious opposition to the death

---

[18] See, also, *Boulden* v. *Holman* (1969), 394 U.S. 478, and *Maxwell* v. *Bishop* (1970), 398 U.S. 262.

penalty in and of itself is not grounds for a challenge for cause. All parties shall be given wide latitude in voir dire questioning in this regard."

In applying the principle set forth in *Witherspoon, supra,* and reflected in R.C. 2945.25(C), in order to uphold appellant's conviction and death sentence, we must be able to safely conclude from the record that the four jurors excluded under the authority of *Witherspoon, supra,* would have been *"unwilling* 'to *consider* all of the penalties provided by state law,' and that each was 'irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings.' * * *" (Emphasis *sic.*) *State* v. *Anderson* (1972), 30 Ohio St. 2d 66, 70 [59 O.O.2d 85], quoting *Witherspoon, supra,* at 522. See, also, *State* v. *Bayless* (1976), 48 Ohio St. 2d 73 [2 O.O.3d 249], vacated in part on other grounds (1978), 438 U.S. 911. Thus we held at paragraph three of the syllabus in *State* v. *Watson* (1971), 28 Ohio St. 2d 15 [57 O.O.2d 95], that:

"In selecting the members of a jury, unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it cannot be assumed that this is his position."

As a necessary corollary to the requirement that a potential juror unequivocally state that he or she would never vote to impose death as a penalty, this court has steadfastly recognized that:

"Compliance with the requirements of *Witherspoon* v. *Illinois,* 391 U.S. 510 [46 O.O.2d 368], necessarily includes sufficient latitude in the *voir dire* examination of prospective jurors in a capital case to establish that those who are dismissed for cause upon the basis of their scruples regarding capital punishment would automatically vote against the imposition of a sentence of death no matter what the trial might reveal." *State* v. *Anderson, supra,* at paragraph one of the syllabus.

However, in *State* v. *Wilson* (1972), 30 Ohio St. 2d 199 [59 O.O.2d 220], syllabus, this court held:

"After a venireman has unambiguously stated, on jury *voir dire,* that he could not vote for the death penalty under any circumstances, a *Witherspoon* violation cannot be predicated merely upon his ambiguous response to a question of defendant's counsel as to whether there is 'anything about the nature of this case that would keep you from listening on the question of the death penalty.' "

The focus of our inquiry must now turn to the *voir dire* of the four excluded jurors.

The first potential juror so excused was Bernard Klein. Klein first responded to the trial judge that he did not believe in capital punishment. Upon further examination by the prosecutor, Klein made the following responses:

"Q. I believe you told Judge Matia that you do not believe in capital punishment.

"A. That's right.

"Q. Many of us have a philosophy one way or we do believe or we do not believe. I am going to ask you, Mr. Klein, even though you do not believe in capital punishment, is it your statement that your disbelief in capital punishment is such that you could not and would not find somebody guilty of a crime in any instance wherein the punishment was capital punishment?

"MR. TITTLE [appellant's trial counsel]: Objection.

"THE COURT: Overruled.

"* * *

"A. * * * There is — how shall I put it? I could say yes, he is guilty, but I could not say, 'Well, this man should be committed to whatever the capital punishment would be.'

"This, I couldn't live with.

"Q. You would consider that in no way?

"A. *I couldn't do it.*" (Emphasis added.)

Appellant's counsel was then able to elicit a statement from Klein to the effect that he would consider the death penalty if an individual had murdered one of Klein's sons in the presence of Klein. Nevertheless, Klein further responded to questioning by appellant's counsel in the following manner:

"Q. Are you saying, sir, that even in a case where a multiple murderer were brought into this courtroom, who had committed vicious ungodly acts, that you would be unable to impose the death penalty?

"A. *Yes.*

"* * *

"Q. * * * But if I understand you correctly, and you correct me if I am wrong, if there were a violent crime that was proved to your absolute satisfaction, you could do it then?

"A. You always have that doubt in your mind, you would always have that doubt in your mind and say, gee, I sent this man to his death or whatever.

"Q. You have said in the case properly proven you would consider it as a penalty?

"A. *No, I didn't say that.*

"Q. Also the law, sir, does not say that you will ever, ever have to impose the death penalty, only that you would have to consider it as a possible penalty.

"Could you tell me that you would never consider it as a possible penalty?

"A. I told you in such cases I would." (Emphasis added.)

The examination of Klein reveals quite clearly that his feelings regarding capital punishment transcended mere moral opposition against its imposition. Rather, Klein unequivocally stated that he would not consider capital punishment as a penalty under any circumstance. At this point,

this potential juror was subject to challenge for cause under the authority of *Witherspoon* and its progeny. In our view, *Witherspoon* does not require a formalistic examination of potential jurors using the precise language of the *Witherspoon* opinion. We need only be satisfied that the potential juror be unwilling to consider capital punishment as a penalty and was committed to voting against the death penalty regardless of the facts of the case. To that extent we are satisfied that Klein unambiguously expressed those commitments.

We are cognizant that Klein's commitment against imposition wavered momentarily when asked if he could consider the death penalty if someone had murdered one of Klein's sons in Klein's presence. Such a momentary hesitation on the part of this potential juror, in response to a hypothetical factual situation not presented by the facts of the case to be tried, will not be considered to abate this potential juror's commitment not to consider the death penalty. We faced a similar situation in *State* v. *Wilson, supra,* where a potential juror gave an ambiguous response to a question after having unambiguously stated that the juror was unalterably opposed to the death penalty. In upholding the challenge for cause of that juror, we stated in *Wilson, supra,* at 202, that the juror's "prior unambiguous responses showed that she was irrevocably committed before the trial began to vote against the death penalty regardless of the facts and circumstances that might emerge in the course of the proceedings." Such is the case at bar and does not command a finding that the trial court committed prejudicial error in excusing Klein as a juror in the trial of appellant.

Appellant next challenges the propriety of the exclusion of potential juror Margaret Sealey. Sealey was initially examined by the prosecutor as to her views on capital punishment as follows:

"Q. * * * Does this mean then in a properly proven case, proof beyond a reasonable doubt, all of the elements of the charge, all the elements of the charge, all the elements of the aggravated murder, all the elements of the aggravated circumstances, that regardless of the nature of the case, and with that degree of proof, that you would, under those circumstances, vote yes for the death penalty?

"A. No, I wouldn't.
"* * *

"Q. You wouldn't what?
"A. I wouldn't vote yes.
"Q. You would not vote for the death penalty?
"A. No."

Sealey reiterated her sentiment on examination by appellant's trial counsel that she would refuse to consider the death penalty as possible punishment. Sealey affirmatively responded to inquiry by the trial court as to whether she was religiously or morally against the imposition of the death penalty. Ultimately, Sealey indicated that, if she had no other

choice, she would follow the law and vote to impose the death penalty. Neither side challenged this juror for cause.

Several days later, while *voir dire* was still taking place, Sealey approached the trial judge and privately informed him that she suffered from hypertension, the symptoms of which were headaches and nosebleeds. Sealey also explained that she had trouble sleeping since being selected as a juror. The trial court transcribed Sealey's discussion in chambers and had it read to the prosecutor and appellant's counsel. The prosecutor stated that he had no objection to excusing Sealey but appellant's counsel insisted that she remain. The trial court declined to excuse her at that point.

Sealey approached the trial court again the next day. Sealey made the following remark to the trial court in chambers:

"I don't feel that I could go through with it, with this case, that long, that length of time, and then, too, I don't believe in capital punishment and I don't think it would be fair for me to proceed with it, with the way I feel, because I — if everybody else votes for capital punishment, I will have to vote against it, even if I feel that he is guilty."

This statement was read to counsel at which point the prosecutor challenged for cause on the basis of Sealey's unequivocal opposition to capital punishment. The trial court proceeded to examine this potential juror as follows:

"Q. Your conscientious, religious, philosophic or other objections to the death penalty are not grounds for you to be excused as a juror. I ask you, therefore, this question: Are you in fact religiously, morally, philosophically or otherwise against the imposition of the death penalty?

"A. Yes.

"Q. Even though you have a conscientious, religious, philosophic, or other opposition to the death penalty, will you nevertheless follow my instructions, as Judge, and fairly consider the imposition of a death sentence, if appropriate in this case? Yes or no, Mrs. Sealey?

"A. *No.*

"Q. What?

"A. *No.*

"Q. Mrs. Sealey, are you stating to me unequivocally that under no circumstances will you follow my instructions as Judge, and that you cannot and will not consider fairly and [*sic*] imposition of the sentence of death, if appropriate, in this case?

"*Yes.*" (Emphasis added.)

Upon examination by the prosecutor, Sealey testified:

"Q. So that if you came to that point and if your fellow jurors came to the point that the man is guilty, and that proof is beyond a reasonable doubt, and that is the instructions of Judge Matia would call for a vote of guilty under those circumstances, and if that vote of guilty meant that he

would go to the electric chair, is it my understanding you could not and would not vote for the death penalty?

"A. *I would not.*" (Emphasis added.)

On examination by appellant's trial counsel, Sealey denied making the foregoing statements in order to be removed from the jury and explained that her prior statements to the effect that she would follow the trial court's instructions had not been completely accurate. Sealey then responded that she had misunderstood the earlier inquiry and had felt that she was required to respond in the manner that she did. The trial court thereafter excused Sealey for cause.

We find no error in this procedure. Appellant's argument to the contrary notwithstanding, we are not of the opinion that once a potential juror has been passed for cause, that juror may never be challenged for cause at a later stage in the proceedings should it subsequently become apparent that a seated juror is subject to a challenge for cause. Neither Crim. R. 24 nor R.C. Chapter 2945 prohibits a challenge for cause after the parties have initially declined to challenge the potential juror for cause. To fashion such a rule as appellant advocates would mean that a juror who becomes properly subject to a challenge for cause after having survived the initial *voir dire* would become immune from such a challenge for cause. Here, Sealey, upon reflection, stated that under no circumstance would she vote for the death penalty, after having testified earlier that she would follow the judge's instructions. It is beyond question that Sealey's statements satisfy the *Witherspoon* standard for exclusion. It is of no moment that her statements to that effect came after she had stated that, if she had no other choice, she would follow the trial court's instructions. Sealey's statement that she would follow the law is, at best, ambiguous in light of her preceding statement that she would not vote for the death penalty. *State* v. *Wilson, supra.* Accordingly, given Sealey's unequivocal commitment to vote against the death penalty under any circumstance and no matter what the facts were, the trial court did not err in excusing this juror in the trial of appellant.

Appellant next contends that the excusal of potential juror Sherry A. Tedeschi was improper. The examination of Tedeschi by the trial court proceeded as follows:

"Q. So what I ask you then is, are you religiously, morally, philosophically or otherwise against the imposition of the death penalty?

"A. *Yes.*

"Q. Listen to the second question as carefully as you obviously did the first.

"Even though you have a conscientious, religious, philosophic or other opposition to the death penalty, will you nevertheless, notwithstanding your feeling you have just told me about, would you nevertheless follow my instructions as Judge and fairly consider the imposition of a sentence of death, if appropriate in this case? Yes or no.

"A. *No.*

"Q. I ask you further, understanding your two answers, are you stating to me unequivocally that under those circumstances will you follow my instructions as Judge and that you cannot and will not consider fairly the imposition of the sentence of death if appropriate, in this case?

"A. *That is correct.*

"Q. Now, you understand the question fully?

"A. *I will not deliver that sentence.*

"Q. I will ask the question in stronger terms. Do you unequivocally state that under no circumstances will you follow my instructions as Judge and consider fairly the imposition of the sentence of death, if appropriate, in this case?

"A. *That is right.*" (Emphasis added.)

On examination by appellant's counsel, Tedeschi responded as follows to the following inquiry:

"Q. You have heard, I am sure in your lifetime, things concerning some very vicious and heinous acts, where multiple murders occurred and one person was responsible, correct?

"A. Yes, I have.

"Q. If it were shown that a defendant in a particular case was that type of person, guilty of those types of crimes, and you were called to deliberate on a verdict on that type of case, are you saying to the court and to me that even in that circumstance, you could not impose the death penalty?

"A. *That's correct.*" (Emphasis added.)

Tedeschi was thereupon excused. The record amply establishes Tedeschi's unequivocal commitment not to consider the death penalty under any circumstance and not to follow the trial court's instruction relating to capital punishment. This potential juror's exclusion was consequently proper under *Witherspoon* and the trial court committed no error in so doing.

The final potential juror excused under the authority of *Witherspoon* was Bonnie Gwynn who was excused as an alternate juror. Upon examination by the trial court and the prosecutor, Gwynn stated initially that she would follow the trial court's instructions and was not against capital punishment. However, when the discussion turned to the potential penalty phase of this proceeding the following exchange took place:

"Q. [By the prosecutor] If you find it to be appropriate, based upon your determination of that evidence and the law that his Honor gives you, it will then become necessary that a jury of 12 people unanimously sign the verdict form indicating, if appropriate, that they recommend the imposition of the death penalty. You must sign a form. Are you with me?

"A. Yes, I follow you.

"Q. If that comes to pass if it is appropriate based upon the informa-

tion given to you and the law that his Honor gives you, are you telling us that you could not sign such a verdict form?

"A. *I could not sign a verdict form.*

"Q. If I understand you correctly, you are saying unequivocally at this point you will not sign a verdict form if appropriate to capital punishment in this case?

"A. *That's right.*" (Emphasis added.)

Appellant's counsel declined to inquire of Gwynn and the trial court excused this potential juror for cause upon the prosecutor's request. Gwynn's remarks unquestionably indicate that she was "irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings." *Witherspoon, supra,* at 522, fn. 21; *State* v. *Anderson, supra,* at 70. As a result, Gwynn was properly excused under *Witherspoon.* Moreover, the jury that was ultimately impaneled served as originally constituted throughout the guilt and penalty phases. Thus, there was no need to seat an alternate juror at any stage of the proceeding. Even if Gwynn had not been excused, she would not have deliberated appellant's fate. Accordingly, there was no error in excusing this potential juror from appellant's trial.

Appellant argues that he was not afforded sufficient latitude in *voir dire* to properly examine the potential jurors regarding their attitudes concerning capital punishment. Appellant correctly states that sufficient latitude must be afforded in the *voir dire* of prospective jurors in a capital case in order to establish that any jurors excused as being opposed to capital punishment were excused within the confines of *Witherspoon.* See *State* v. *Anderson, supra,* at paragraph one of the syllabus, and R.C. 2945.25(C). Examination of the record in the case at bar indicates that any restrictions placed on appellant's examination of prospective jurors did not constitute reversible error. The general rule is that the scope of the examination of prospective jurors is within the discretion of the trial court and the judgment will only be reversed upon a showing that the trial court abused its discretion in restricting the scope of *voir dire. Pavilonis* v. *Valentine* (1929), 120 Ohio St. 154, 157; *Dowd-Feder, Inc.* v. *Truesdell* (1936), 130 Ohio St. 530 [5 O.O. 179]; *State* v. *Anderson, supra,* at 72-73.

In the case at bar, appellant sought to ask questions of the prospective jurors who had expressed a commitment to vote against the death penalty under all circumstances concerning whether these prospective jurors would vote for the death penalty if Adolf Hitler or Charles Manson were the accused. While the trial court did not permit such questioning, appellant was permitted to ask Klein whether he would agree to the death penalty if one of his sons had been murdered. Appellant was likewise permitted to propose the situation of a mass murder to Klein and Tedeschi. We find no abuse of discretion in the limitation of *voir dire* by the trial court. Appellant's reliance on *State* v. *Anderson, supra,* does not compel

reversal of appellant's death sentence. In *Anderson* both the prosecutor and defense counsel were prohibited from asking any questions whatsoever of prospective jurors concerning their attitudes toward capital punishment. Appellant is hardly in a position to argue that an analogous situation is presented in the instant case.

Accordingly, the jurors in this case who were dismissed based on their views against capital punishment were excused in a manner consistent with *Witherspoon* v. *Illinois, supra,* and its progeny, as well as within the standard set forth in R.C. 2945.25(C).[19]

Appellant next argues that two separate juries are required in a capital case since "death-qualifying" a jury prior to the guilt phase renders that jury prone to convict and deprives a capital defendant of an impartial and representative jury. Appellant's position is that a non-death-qualified jury must decide guilt or innocence and then, if the defendant is convicted of a capital offense, a second jury, which may be death-qualified, must be impaneled to determine whether to recommend the death penalty. We are unpersuaded by appellant's argument.

As we have already discussed under Part I of this decision, the United States Supreme Court, although sanctioning the bifurcation of capital prosecutions into guilt and penalty phases, has never required separate juries for each phase. Appellant argues herein that the United States Supreme Court in *Witherspoon* v. *Illinois, supra,* at 517-518, left the question open due to insufficient scientific data where it was stated:

"* * * We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction. In light of the presently available information, we are not prepared to announce a *per se* constitutional rule requiring the reversal of every conviction returned by a jury selected as this one was."

Appellant now suggests that scientific data indicates that death-qualified juries, that is, juries whose members do not include individuals excused under *Witherspoon, supra,* are prone to convict. It is appellant's contention that the question reserved in *Witherspoon* may now be answered by adopting a *per se* rule against death-qualifying a jury prior to the guilt phase of a bifurcated capital prosecution. We reject appellant's contention for the following reasons.

In *Keeten* v. *Garrison* (C.A.4, 1984), 742 F. 2d 129, the identical argu-

---

[19] The United States Supreme Court, on October 2, 1984, heard arguments in *Wainwright* v. *Witt,* No. 83-1427, certiorari granted (1984), __ U.S. __, 80 L. Ed. 2d 551, which presented, *inter alia,* questions concerning the application of *Witherspoon* v. *Illinois, supra.* While we certainly are unable to anticipate the holding in *Witt,* or what pronouncement might result, we are nevertheless confident that unless the Supreme Court overrules *Witherspoon,* the jurors excluded herein were dismissed in accord with the established principles of selecting a jury in a capital prosecution.

ment was rejected for what we believe to be sound reasons. The court in *Keeten, supra,* stated at 133:

"Although the right to a jury trial includes the right to a jury venire drawn from a representative cross-section of the community,[20] it does not include the right to be tried by jurors who are unable or unwilling to follow the law and the instructions of the trial judge in a capital case."

It was stated by the United States Supreme Court in *Adams* v. *Texas* (1980), 448 U.S. 38, 45, that:

"The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court."

The thrust of appellant's argument is that he feels entitled to a jury more likely to acquit rather than an impartial jury. *Keeten, supra,* at 134. It was stated in *Smith* v. *Balkcom* (C.A. 5, 1981), 660 F. 2d 573, 579, certiorari denied (1982), 459 U.S. 882:

"The guarantee of impartiality cannot mean that the state has a right to present its case to the jury *most* likely to return a verdict of guilt, nor can it mean that the accused has a right to present his case to the jury *most* likely to acquit. But the converse is also true. The guarantee cannot mean that the state must present its case to the jury *least* likely to convict or impose the death penalty, nor that the defense must present its case to the jury *least* likely to find him innocent or vote for life imprisonment." (Emphasis *sic.*)

It follows that, in striving to achieve an impartial jury — one that will fairly judge the facts and apply the law as instructed — the principles set forth in *Witherspoon, supra,* justify excluding those jurors who would never impose the death penalty. Jurors subject to challenge under *Witherspoon* because they refuse to follow the law not only render the jury impartial for the penalty phase, but also for the guilt phase, of the trial as well. Accord *Rector* v. *State* (1983), 280 Ark. 385, 659 S.W. 2d 168.

Accordingly, we hold that to death-qualify a jury prior to the guilt phase of a bifurcated capital prosecution does not deny a capital defendant a trial by an impartial jury.

### III

Appellant next argues that he was denied his statutory and constitutional rights to present evidence in mitigation of the death penalty by the trial court's action in excluding, as either irrelevant or incompetent, evidence proffered for purposes of mitigation at the sentencing phase of trial.

R.C. 2929.04(B) requires the court and jury to consider as mitigating factors:

"* * * the nature and circumstances of the offense, the history, character, and background of the offender, and all of the following factors:

---

[20] *Taylor* v. *Louisiana* (1975), 419 U.S. 522.

"(1) Whether the victim of the offense induced or facilitated it;

"(2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;

"(3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law;

"(4) The youth of the offender;

"(5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;

"(6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;

"(7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death."

R.C. 2929.04(C) further provides that a defendant shall be given great latitude in the presentation of evidence concerning mitigating factors.

These provisions are in conformity with the holding of the United States Supreme Court that "'* * * the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (Emphasis *sic.*) *Lockett* v. *Ohio, supra* (438 U.S.), at 604. This holding was recently reaffirmed in *Eddings* v. *Oklahoma* (1982), 455 U.S. 104, 113-114, the court stating:

"Just as a State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law,* any relevant mitigating evidence." (Emphasis *sic.*)

Thus, courts are required to consider all *relevant* mitigating evidence. As a footnote to the passage cited above from *Lockett,* the court stated that, "[n]othing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Lockett, supra,* at 604, fn. 12.

The testimony of three witnesses was excluded as irrelevant, including that of Dr. William C. Bailey, a social scientist from Cleveland State University. Bailey's testimony, to the effect that statistics failed to show that capital punishment was a deterrent to murder, was proffered for the record.

Second, the trial court excluded as irrelevant the testimony of Lloyd McClendon, a former death row inmate. He would have testified generally

as to the potential for rehabilitation of death row inmates. Third, the court refused requested funds to obtain the expert testimony of Dr. Nemunaitis, a specialist in the rehabilitation of paraplegics. Nemunaitis had never examined or evaluated appellant, but would have testified as to the specific physical problems faced by paraplegics. He would also have testified that paraplegics have a shorter life expectancy which would be further reduced under conditions of imprisonment.

We agree that this testimony was clearly irrelevant. Bailey and McClendon would have testified regarding issues directed to the philosophy behind capital punishment, generally, as opposed to anything directly related to appellant. Indeed, we believe admission of this type of evidence would divert the jury from its duty to impose a sentence within the confines of the guidelines fixed by statute and turn its attention to the wisdom of enacting it in the first place. That is a matter within the province of the General Assembly. Similarly, Nemunaitis' testimony would have offered no insight into the character of appellant or the circumstances of this offense. Other evidence at trial established that appellant is a paraplegic as the result of a gunshot wound he received during the exchange of gunfire with Officer Johnson. Since Nemunaitis had never examined or evaluated appellant, we fail to see any relevance of his testimony to appellant. As the United States Supreme Court has stressed, "[w]hat is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime." *Zant* v. *Stephens, supra* (77 L. Ed. 2d), at 251; *Barclay* v. *Florida, supra* (77 L. Ed. 2d), at 1149.

The court also excluded, as incompetent hearsay, the testimony of Loretta T. Jenkins, appellant's wife, to the effect that sometime after the offense she learned that Lester Jordan had allegedly threatened harm against her to appellant in order to induce appellant to participate in the bank robbery. The testimony was offered to show that appellant had acted under duress in committing the robbery and was manipulated by Jordan. The substance of this testimony was not corroborated by any other witness, but was mentioned by appellant in his statement to the jury. The court refused to allow this testimony for the reason that Mrs. Jenkins had no personal knowledge of the threats but had heard about them after the crime. Mrs. Jenkins was permitted to testify that she perceived appellant to be somewhat protective of her prior to the offense.

It is uncontroverted that this testimony was hearsay and outside the personal knowledge of the witness and thus inadmissible under Evid. R. 802 and 602. We recognize that " 'the hearsay rule may not be applied mechanistically to defeat the ends of justice.' " *Green* v. *Georgia* (1979), 442 U.S. 95, 97, quoting *Chambers* v. *Mississippi* (1973), 410 U.S. 284, 302. However, we find none of the indicia of reliability which the court found compelling in overriding the evidentiary defects of testimony sought to be admitted in *Green* v. *Georgia, supra.* In *Green,* two defendants were

tried separately for the murder of one person (*id.* at 95), the prosecution's theory being that each defendant had fired one shot into the victim. *Id.* at 96, fn. 2. It was offered by hearsay testimony that Green's accomplice had admitted to firing both shots. *Id.* Further, the disputed testimony had been admitted at the accomplice's trial. *Id.* Thus, the court found:

"* * * [S]ubstantial reasons existed to assume its reliability. Moore made his statement spontaneously to a close friend. The evidence corroborating the confession was ample, and indeed sufficient to procure a conviction of Moore and a capital sentence. The statement was against interest, and there was no reason to believe that Moore had any ulterior motive in making it. Perhaps most important, the State considered the testimony sufficiently reliable to use it against Moore, and to base a sentence of death upon it." *Id.* at 97.

Here, the statement was not made by the accomplice, and was not corroborated, but was discovered by appellant's wife after the crime, and thus we find no compelling reason to disregard application of the Rules of Evidence. The trial court correctly excluded this evidence.

Appellant also contends that the trial court erred in instructing the jury not to consider sympathy for the accused in making its recommendation as to sentence.

Appellant essentially contends that by instructing the jury not to consider sympathy, the court implicitly instructed the jury not to consider the evidence offered in mitigation.

Specifically at issue is the following instruction by the trial court:

"You must not be influenced by any consideration of sympathy or prejudice. It is your duty to carefully weigh the evidence to decide all disputed questions of fact, to apply the instructions of the Court to your findings, and to render your verdict accordingly.

"In fulfilling your duty, your efforts must be to arrive at a just verdict. Consider all the evidence and make your finding with intelligence and impartiality, and without bias, sympathy or prejudice, so that the State of Ohio and the defendant will feel that their case was fairly and impartially tried."

This instruction was given at the end of the charge. Earlier, the judge had specifically instructed the jury to consider evidence in mitigation, stating:

"* * * Mitigating factors are factors that, while they do not justify or excuse the crime, nevertheless, in fairness and mercy, may be considered by you as extenuating or reducing the degree of the defendant's blame or punishment."

The judge then enumerated all of the factors outlined in R.C. 2929.04(B), and explained the process of weighing mitigating factors against aggravating circumstances defined by statute.

Appellant relies on authorities from other states which prohibit the trial court from instructing the jury at the sentencing phase of a capital

case not to consider mercy, sympathy or compassion for the accused in reaching their verdict. See *People* v. *Easley* (1983), 34 Cal. 3d 858, 671 P. 2d 813; *Legare* v. *State* (1983), 250 Ga. 875, 302 S.E. 2d 351. It is the opinion of these courts that this charge could mislead the jury despite a correct charge as to mitigating factors.

We do not share the view that this instruction should be given enhanced significance over the charge as a whole and over the court's specific charge as to mitigation. To the contrary, we believe this instruction should be viewed in the context in which it is given. See *State* v. *Watson* (La. 1984), 449 So. 2d 1321, 1331-1332.

The instruction to the jury in the penalty phase of a capital prosecution to exclude consideration of bias, sympathy or prejudice is intended to insure that the sentencing decision is based upon a consideration of the reviewable guildelines fixed by statute as opposed to the individual juror's personal biases or sympathies. We believe the instruction adequately conveys this purpose by using the term "sympathy" together with the terms "bias" and "prejudice." When read in conjunction with a correct instruction as to mitigation, as was the case here, the jury is directed to focus on the guidelines set forth by statute.

We think this direction is necessary and entirely consistent with the view expressed by the United States Supreme Court in *Barclay* v. *Florida, supra,* at 1144, that, "[t]he thrust of our decisions on capital punishment has been 'that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.' *Zant* v. *Stephens,* ____ U.S. ____, * * * 77 L. Ed. 2d 235 * * * (1983), quoting *Gregg* v. *Georgia,* 428 U.S. 153, 189 * * * (1976) (opinion of Stewart, Powell, and Stevens, JJ.)."

Accordingly, this argument is without merit.

## IV

Appellant also challenges the trial court's denial of certain requests for funding to obtain expert assistance. Appellant, an indigent, argues that the denial of funding for expert assistance was in violation of R.C. 2929.024 and amounted to a denial of his right to effective assistance of counsel guaranteed by the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution.

R.C. 2929.024 provides, in relevant part:

"If the court determines that the defendant is indigent and that investigation services, experts, or other services are reasonably necessary for the proper representation of a defendant charged with aggravated murder at trial or at the sentencing hearing, the court shall authorize the defendant's counsel to obtain the necessary services for the defendant, and shall order that payment of the fees and expenses for the necessary · services be made in the same manner that payment for appointed counsel is made * * *." Thus, R.C. 2929.024 requires the court to provide an in-

digent defendant with expert assistance whenever, in the sound discretion of the court, the services "* * * are reasonably necessary for the proper representation of a defendant charged with aggravated murder * * *."

The extent to which the provision of expert assistance to an indigent defendant is constitutionally required has not been established. However, in *Britt* v. *North Carolina* (1971), 404 U.S. 226, at 227, while expressly declining to define the outer limits of the rule, the court reaffirmed the principle established in *Griffin* v. *Illinois* (1956), 351 U.S. 12, that "* * * the State must, as a matter of equal protection, provide indigent prisoners with the basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners." In *Britt*, the court was confronted with the issue of whether the petitioner had been improperly denied a copy, at state expense, of the transcript of proceedings from his first trial which resulted in a deadlocked jury, for use at his second trial. The two factors which the court considered in determining whether the transcript was necessary were "* * * (1) the value of the transcript to the defendant in connection with the appeal or trial for which it is sought, and (2) the availability of alternative devices that would fulfill the same functions as a transcript." *Id.* The court concluded that the transcript was valuable to the defendant for use in his second trial, but upheld the denial of its provision at state expense because the evidence established that the court reporter would have read back to counsel the notes from the mistrial had he been requested to do so. *Id.* at 228-229.

While the assistance sought by appellant is not a transcript, we believe a standard comparable to that employed in *Britt* would serve as well to determine whether the trial court abused its discretion in denying a funding request for expert assistance under R.C. 2929.024. Tailoring the considerations to the inquiry necessary under R.C. 2929.024, the factors to consider are (1) the value of the expert assistance to the defendant's proper representation at either the guilt or sentencing phase of an aggravated murder trial, and (2) the availability of alternative devices that would fulfill the same functions as the expert assistance sought.

Specifically, appellant sought funding for a sociologist to assist at the hearing challenging death-qualified juries. This expert would have been employed to provide sociological data to support appellant's argument that the use of death-qualified juries results in unfair sentencing. (See Part II, *supra.*) Appellant also sought the services of a social scientist to assist in jury selection who would have provided counsel with advice as to the significance of a potential juror's body language, voice inflection, etc. Lastly, appellant requested expert assistance for purposes of his change-of-venue motion based on pretrial publicity. Appellant asserts that expert testimony would have supported his argument that pretrial publicity prevented a fair trial in Cleveland, but does not specify what that testimony would have been.

Applying the factors we enumerated above to the specific requests

made by appellant, we conclude that the trial court properly denied funding for these witnesses.

The sociological data with regard to death-qualified juries was available by way of studies and reports that were reduced to writing and available to appellant. These are part of the record in this case and an additional expert to testify at the hearing would not have added anything of significance to this data.

There is also nothing to support appellant's contention that the services of a social scientist would have been valuable to aid counsel in jury selection, or to establish the effects of pretrial publicity. The experts sought here would have been no more than consultants to counsel as opposed to sources of evidence relevant to disputed factual issues.

The authority relied upon by appellant from other jurisdictions is inapposite, because the expert testimony sought in those cases did relate to disputed factual matters. See *Williams* v. *Martin* (C.A. 4, 1980), 618 F. 2d 1021 (medical evidence concerning the victim's cause of death); *Hintz* v. *Beto* (C.A. 5, 1967), 379 F. 2d 937; and *Bush* v. *McCollum* (N.D. Tex. 1964), 231 F. Supp. 560, affirmed (C.A. 5, 1965), 344 F. 2d 672 (psychological evaluations of defendant where the sanity of the accused was an issue); *United States* v. *Durant* (C.A. 2, 1976), 545 F. 2d 823 (expert fingerprint witness where fingerprint evidence was pivotal).

Requests comparable to appellant's have been denied in other jurisdictions. See *United States* v. *Harris* (C.A. 7, 1976), 542 F. 2d 1283, certiorari denied *sub nom. Clay* v. *United States* (1977), 430 U.S. 934 (clinical psychologist to aid in jury selection and urban sociologist); *State* v. *Greenawalt* (1981), 128 Ariz. 150, 624 P. 2d 828, certiorari denied (1981), 454 U.S. 882 (public opinion pollster regarding change of venue); *State* v. *Smith* (1979), 123 Ariz. 231, 599 P. 2d 187 (jury selection and pretrial publicity experts).

Accordingly, this argument is without merit.

## V

Appellant's next contention focuses upon whether the aggravating circumstances of which he was convicted overlap and, if so, whether such a practice artificially inflates the aggravating circumstances so as to deviate from the Supreme Court's holding in *Godfrey* v. *Georgia* (1980), 446 U.S. 420, that states must tailor and apply death penalties in order to avoid arbitrary and capricious sentences.

Appellant was charged and convicted of five aggravating circumstances, all of which were employed at the sentencing phase of his trial. Those specifications are summarized as follows:

(1) R.C. 2929.04(A)(3)[21] — the defendant committed the offense for the purpose of escaping apprehension for aggravated robbery.

[21] R.C. 2929.04(A)(3) sets forth an aggravating circumstance when "[t]he offense was committed for the purpose of escaping detection, apprehension, trial, or punishment for another offense committed by the offender."

(2) R.C. 2929.04(A)(5)[22] — the offense was part of a course of conduct involving the purposeful killing of, or attempt to kill, two or more persons (*i.e.,* Officers Johnson and Myhand).

(3) R.C. 2929.04(A)(6)[23] — the victim of the aggravated murder was a peace officer whom the defendant knew to be such, and who was engaged in his duties at the time.

(4) R.C. 2929.04(A)(7)[24] — the defendant committed the aggravated murder while he was committing or fleeing immediately after committing or attempting to commit aggravated robbery.

(5) R.C. 2929.04(A)(7) — the defendant committed the aggravated murder while he was committing or fleeing immediately after committing or attempting to commit kidnapping.

Appellant contends that specifications one and four, as well as four and five, are duplicative. Appellant recognizes that the presentation of overlapping aggravating circumstances at the guilt phase of a capital trial is allowable[25]; however, when a jury is charged under R.C. 2929.03 with the responsibility of weighing aggravating circumstances and mitigating factors, appellant argues that duplicative aggravating circumstances inflate the weighing process in favor of the state. Thus, appellant charges that the state, by overlapping aggravating circumstances at the sentencing stage of a capital case, unfairly increases the likelihood of a death recommendation.

In *People* v. *Harris* (1984), 36 Cal. 3d 36, 201 Cal. Rptr. 782, 679 P. 2d 433, the Supreme Court of California addressed overlapping aggravating circumstances, which included the intent to commit larceny and robbery, as follows:

---

[22] The aggravating circumstance provided under R.C. 2929.04(A)(5) provides:

"Prior to the offense at bar, the offender was convicted of an offense an essential element of which was the purposeful killing of or attempt to kill another, or the offense at bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender."

[23] The aggravating circumstance contained under R.C. 2929.04(A)(6) states:

"The victim of the offense was a peace officer, as defined in section 2935.01 of the Revised Code, whom the offender had reasonable cause to know or knew to be such, and either the victim, at the time of the commission of the offense, was engaged in his duties, or it was the offender's specific purpose to kill a peace officer."

[24] R.C. 2929.04(A)(7) creates an aggravating circumstance if:

"The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson, aggravated robbery, or aggravated burglary, and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design."

[25] Appellant's counsel concedes in his brief that the state may present alternative aggravating circumstances at the guilt phase of a capital case:

"The state claims it should be permitted to advance alternate theories in support of conviction. However, that argument is valid only at the guilt phase where they must provide factual proof of the offense(s) committed. * * *"

"The use in the penalty phase of both these special circumstance allegations thus artificially inflates the particular circumstances of the crime and strays from the high court's mandate that the state 'tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty.' (*Godfrey* v. *Georgia* [1980], 446 U.S. 420 at p. 428. * * *) The United States Supreme Court requires that the capital-sentencing procedure must be one that 'guides and focuses the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death.' (*Jurek* v. *Texas* [1976], 428 U.S. 262, at pp. 273-274 * * *.) That requirement is not met in a system where the jury considers the same act or an indivisible course of conduct to be more than one special circumstance." *Id.* at 798.

In *Provence* v. *State* (Fla. 1976), 337 So. 2d 783, certiorari denied (1977), 431 U.S. 969, the Florida Supreme Court rejected the application of two aggravating circumstances (*i.e.*, murder during a robbery and murder for pecuniary gain), stating:

"* * * [I]n some cases, such as where a larceny is committed in the course of a rape-murder, * * * [the circumstances] refer to separate analytical concepts and can validly be considered to constitute two circumstances[.] [H]ere, as in all robbery-murders, both subsections refer to the *same aspect* of the defendant's crime. Consequently, one who commits a capital crime in the course of a robbery will always begin with two aggravating circumstances against him while those who commit such a crime in the course of any other enumerated felony will not be similarly disadvantaged." (Emphasis *sic.*) *Id.* at 786.

In *State* v. *Goodman* (1979), 298 N.C. 1, 257 S.E. 2d 569, the Supreme Court of North Carolina also struck down the use of duplicative special circumstances. The circumstances at issue included "avoiding or preventing lawful arrest," and that the "capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws." The court concluded that the submission of both circumstances to the jury resulted "in an automatic cumulation of aggravating circumstances against the defendant." *Id.* at 29. See, also, *People* v. *Brownell* (1980), 79 Ill. 2d 508, 404 N.E. 2d 181; *Cook* v. *State* (Ala. 1978), 369 So. 2d 1251; *State* v. *Rust* (1977), 197 Neb. 528, 250 N.W. 2d 867.

Having reviewed the aforementioned authorities, we first examine whether any unnecessary duplication was present under specifications one and four. R.C. 2929.04(A)(3) sets forth an aggravating circumstance when "[t]he offense was committed for the purpose of escaping * * * apprehension * * * for another offense committed by the offender." In the same vein, R.C. 2929.04(A)(7) provides an aggravating circumstance if "[t]he offense was committed while the offender was * * * fleeing immediately after committing or attempting to commit * * * aggravated robbery * * *."

The overlap or duplication occurs in view of the likelihood that in most felony murders, death occurs while the offense is being committed or while fleeing from the scene in order to facilitate escape or to prevent apprehension. In fact, this precise situation occurred in the present case. Thus, under these circumstances, a defendant would likely be charged and convicted of a specification under R.C. 2929.04(A)(7). However, since the specification contained within R.C. 2929.04(A)(3) applies to many factual situations likely to arise in connection with a felony murder, unnecessary duplication occurs.

This is not to say that under circumstances different than those presented here, a capital defendant could not be convicted of an aggravating circumstance under R.C. 2929.04(A)(3), as well as R.C. 2929.04(A)(7). In the present case, however, these multiple aggravating circumstances were applied at the sentencing phase in an overzealous manner to the same act or indivisible course of conduct. Accordingly, we apply the doctrine of merger[26] and conclude that in weighing aggravating circumstances and mitigating factors, the specification under R.C. 2929.04(A)(3) should merge with the specification set forth under R.C. 2929.04(A)(7).[27]

In addition, we also agree with appellant that under the facts of this case the submission of two aggravating circumstances under R.C. 2929.04(A)(7), for the commission of aggravated murder in the course of a kidnapping and in the course of aggravated robbery, was unnecessarily cumulative.

In *State* v. *Logan* (1979), 60 Ohio St. 2d 126 [14 O.O.3d 373], this court was confronted with the question of when a defendant may be convicted of kidnapping[28] and another offense of the same or similar kind in conjunction with Ohio's multiple-count statute. The guidelines set forth in the syllabus are as follows:

"(a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus suffi-

---

[26] Cf. *State* v. *Botta* (1971), 27 Ohio St. 2d 196, 201 [56 O.O.2d 119], for an application of the doctrine of merger in a criminal context.

[27] In reaching this result, we are guided by principles espoused in considering the doctrine of merger under R.C. 2941.25, Ohio's multiple-count statute.

[28] As is pertinent to the instant case, R.C. 2905.01 provides:

"(A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where he is found or restrain him of his liberty, for any of the following purposes:

"(1) To hold for ransom, or as a shield or hostage;

"(2) To facilitate the commission of any felony or flight thereafter;

"(3) To terrorize, or to inflict serious physical harm on the victim or another;

"(4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against his will;

"(5) To hinder, impede, or obstruct a function of government, or to force any action or concession on the part of governmental authority."

cient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;

"(b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions."

As the *Logan* court recognized, the critical consideration "is whether the restraint or movement of the victim is merely incidental to a separate underlying crime or, instead, whether it has a significance independent of the other offense." *Id.* at 135. Cf. *State* v. *Price* (1979), 60 Ohio St. 2d 136, at 143 [14 O.O.3d 379].

Our review of the record leads us to conclude that although appellant did aim his firearm at various individuals inside the bank,[29] as well as order other persons therein to the rear of the building, such restraint or movement of the victims was incidental to the separate underlying circumstance under R.C. 2929.04(A)(7), of committing aggravated murder during the course of an aggravated robbery.

Accordingly, we conclude that specifications one and five are unnecessarily cumulative and, therefore, should be merged into specification number four. Nevertheless, our conclusion, which leaves undisturbed specifications two, three and four, does not, in and of itself, necessitate that appellant be resentenced.

In *Zant* v. *Stephens, supra,* the Georgia Supreme Court had struck down as unconstitutionally vague one of three aggravating circumstances considered by the jury in the defendant's capital trial.[30] In spite of this action, the Georgia court did not order the defendant to be resentenced. Instead, the court concluded that since the evidence concerning the defective

---

[29] As observed in *Logan, supra,* to constitute kidnapping under R.C. 2905.01, no movement is required. Rather, restraint by force, threat or deception is all that need be demonstrated. Thus, implicit within every robbery (and aggravated robbery) is a kidnapping. *Id.* at 130.

[30] Section 27-2534.1(b) of the Georgia Code provided, in part:

"In all cases of other offenses for which the death penalty may be authorized, the judge shall consider, or he shall include in his instructions to the jury for it to consider, any mitigating circumstances or aggravating circumstances otherwise authorized by law and any of the following statutory aggravating circumstances which may be supported by the evidence:

"(1) The offense of murder * * * was committed by a person who has a substantial history of serious assaultive criminal convictions."

This portion of subsection (b)(1) was found to be unconstitutionally vague in *Arnold* v. *State* (1976), 236 Ga. 534, 224 S.E. 2d 386, as later applied in *Stephens* v. *State* (1976), 237 Ga. 259, 227 S.E. 2d 261, certiorari denied (1976), 429 U.S. 986.

aggravating circumstance was otherwise admissible, and since the verdict was adequately supported by the evidence, resentencing was not required.

Upon review, the United States Supreme Court affirmed. The court specifically looked to the admissibility of the evidence absent its designation as an aggravating circumstance, and the scope of the mandatory review provided by the Georgia Supreme Court in determining the propriety of the sentence. Since the evidence was otherwise admissible and the Georgia Supreme Court had reviewed the sentence in order to guard against arbitrariness and to assure proportionality, the United States Supreme Court did not vacate the sentence. As noted by Justice Rehnquist in his concurring opinion: "[w]hatever a defendant must show to set aside a death sentence, the present case involved only a remote possibility that the error had any effect on the jury's judgment; the Eighth Amendment did not therefore require that the defendant's sentence be vacated." *Id.* at 267.[31]

As in *Zant,* the evidence supporting the merged aggravating circumstances in the present case was clearly admissible. Moreover, like the Georgia Supreme Court, the scope of mandatory review provided by this court in capital cases is extensive in order to guard against arbitrary, capricious and disproportionate sentencing. Specifically, under R.C. 2929.05(A), our function parallels that of a jury when the sentence of death is imposed, in that we are bound to "* * * independently weigh all of the facts and other evidence disclosed in the record in the case and consider the offense and the offender to determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in the case, and whether the sentence of death is appropriate." Equally important is the fact that in his charge to the jury, the trial judge herein made no suggestion that "the presence of more than one aggravating circumstance should be given special weight." *Id.* at 258.

We therefore conclude that although two of the aggravating circumstances should have been merged into the remaining three circumstances, this does not, standing alone, require that appellant's sentence be set aside. Any remote possibility of error that this had upon the jury's judgment can be guarded against when this court undertakes its responsibility (*infra* at Part VII), to weigh all of the evidence and determine whether the remaining three aggravating circumstances which ap-

---

[31] In addressing a similar situation in *White* v. *State* (Fla. 1984), 446 So. 2d 1031, 1037, wherein the trial court had erroneously doubled two aggravating circumstances, the Supreme Court of Florida sustained the sentence of death based upon the remaining aggravating factors, stating:

"When there are one or more valid aggravating factors which support a death sentence, in the absence of any mitigating factor(s) which might override the aggravating factors, death is presumed to be the appropriate penalty. *White* v. *State,* 403 So. 2d 331 (Fla. 1981), *cert. denied,* ____ U.S. ____, * * * 77 L. Ed. 2d 1412 (1983); *State* v. *Dixon,* 283 So. 2d 1 (Fla. 1973), *cert. denied,* 416 U.S. 943, * * * 40 L. Ed. 2d 295 (1974)."

pellant was found guilty of committing outweigh the mitigating factors present in the case.

Accordingly, in the penalty phase of a capital prosecution, where two or more aggravating circumstances arise from the same act or indivisible course of conduct and are thus duplicative, the duplicative aggravating circumstances will be merged for purposes of sentencing. Should this merging of aggravating circumstances take place upon appellate review of a death sentence, resentencing is not automatically required where the reviewing court independently determines that the remaining aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt and that the jury's consideration of duplicative aggravating circumstances in the penalty phase did not affect the verdict.

## VI

Appellant next challenges that the trial court's jury instruction, as to the binding effect of a death penalty sentence compared to a sentence of life imprisonment, unfairly biased the jury in favor of returning a death penalty verdict in violation of the Eighth and Fourteenth Amendments to the United States Constitution, as well as Sections 5 [sic] and 16, Article I of the Ohio Constitution.

As is apparent from a reading of R.C. 2929.03(D)(2),[32] a jury's determination to impose life imprisonment with parole eligibility after defendant's serving either twenty or thirty full years is binding upon the trial court. On the other hand, a jury verdict imposing the death penalty is advisory to the extent that under R.C. 2929.03(D)(3)[33] the trial court has the

---

[32] R.C. 2929.03(D)(2) provides:

"Upon consideration of the relevant evidence raised at trial, the testimony, other evidence, statement of the offender, arguments of counsel, and, if applicable, the reports submitted pursuant to division (D)(1) of this section, the trial jury, if the offender was tried by a jury, shall determine whether the aggravating circumstances the offender was found guilty of committing are sufficient to outweigh the mitigating factors present in the case. If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender. Absent such a finding, the jury shall recommend that the offender be sentenced to life imprisonment with parole eligibility after serving twenty full years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment.

"If the trial jury recommends that the offender be sentenced to life imprisonment with parole eligibility after serving twenty full years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment, the court shall impose the sentence recommended by the jury upon the offender. If the trial jury recommends that the sentence of death be imposed upon the offender, the court shall proceed to impose sentence pursuant to division (D)(3) of this section."

[33] R.C. 2929.03(D)(3) provides:

"Upon consideration of the relevant evidence raised at trial, the testimony, other evidence, statement of the offender, arguments of counsel, and, if applicable, the reports submitted to the court pursuant to division (D)(1) of this section, if, after receiving pursuant to

responsibility to independently weigh the evidence in order to determine whether the aggravating circumstances outweigh mitigating factors.

In view of the statutory framework, the trial court charged the jury as follows:

"A jury recommendation to the Court that the death penalty be imposed is just that, a recommendation, and is not binding upon the Court. The final decision as to whether the death penalty shall be imposed upon the appellant rests upon this Court.

"In the final analysis, after following the procedures and applying the criteria set forth in the statute, I, the judge, will make the decision as to whether the defendant, Leonard Jenkins, will be sentenced to death or to life imprisonment."

Appellant objects to this instruction, arguing that it diminished the jury's responsibility, thereby encouraging a death penalty recommendation so as to obtain judicial review thereof. Although recognizing the role of a judge in reviewing a jury's death penalty recommendation, appellant contends it constitutes reversible error to so inform the jury absent a statutory directive.

In support of this contention appellant principally relies upon *Wiley* v. *State* (Miss. 1984), 449 So. 2d 756, and *Williams* v. *State* (Miss. 1984), 445 So. 2d 798. Although in each of these cases death sentences were reversed, in part, upon prosecutorial references to further review, the court was careful to point out in its decisions that reversal was predicated upon state law principles in accordance with the decision in *California* v. *Ramos* (1983), ___ U.S. ___, 77 L. Ed. 2d 1171.

In *Ramos,* the trial court was required by statute to instruct the jury that the Governor had the authority to commute a life sentence without parole, so that parole would indeed be possible.[34] Although the Governor

division (D)(2) of this section the trial jury's recommendation that the sentence of death be imposed, the court finds, by proof beyond a reasonable doubt, or if the panel of three judges unanimously finds, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, it shall impose sentence of death on the offender. Absent such a finding by the court or panel, the court or the panel shall impose one of the following sentences on the offender:

"(a) Life imprisonment with parole eligibility after serving twenty full years of imprisonment;

"(b) Life imprisonment with parole eligibility after serving thirty full years of imprisonment."

[34] The instruction, referred to as the "Briggs Instruction," was incorporated pursuant to voter initiative into Cal. Penal Code Ann. Section 190.3. At trial in *Ramos,* the judge charged the jury under the Briggs Instruction as follows:

" 'You are instructed that under the State Constitution a Governor is empowered to grant a reprieve, pardon, or commutation of a sentence following conviction of a crime.

" 'Under this power a Governor may in the future commute or modify a sentence of life imprisonment without possibility of parole to a lesser sentence that would include the possibility of parole.' " *California* v. *Ramos* (1983), ___ U.S. ___, 77 L. Ed. 2d 1171, 1177.

could also commute a death sentence, this fact was not made known to the jury. The defendant challenged this scheme, arguing before the United States Supreme Court that the instruction had a significant impact upon the jury's determination, thus leading to the imposition of a death sentence in order to foreclose the possibility of parole.

The instruction was, however, upheld. The court stated that, "* * * the State is constitutionally entitled to permit juror consideration of the Governor's power to commute a life sentence. This information is relevant and factually accurate and was properly before the jury." *Id.* at 1188. Continuing, the court recognized that such an instruction "* * * does not preclude individualized sentencing determinations or consideration of mitigating factors, nor does it impermissibly inject an element too speculative for the jury's deliberation." *Id.* The court concluded that although the instruction is not prohibited by the Eighth and Fourteenth Amendments, states are free to provide greater protections under state law principles.

This conclusion was echoed by the Supreme Court of Mississippi in *Wiley* and *Williams, supra,* when the court recognized that in reviewing the propriety of arguments which mention the subject of further review, states are free to elect several alternatives.[35] Reference may be made to the subject of further review, "so long as what is said is accurate and correct." *Williams, supra,* at 811, citing *California* v. *Ramos, supra.*

Under Mississippi jurisprudence, the court in *Wiley* and *Williams* set forth the rule that in a death penalty case the jury should never be advised that their decision can be subsequently corrected, and any reference to the contrary constitutes reversible error.[36] Although cognizant of the competing interests which led the court to this conclusion, we decline to take such a giant step and adopt a *per se* rule in this regard. While we prefer that in the future no reference be made to the jury regarding the finality of their decision, we are unable to conclude that the Ohio Constitution

---

[35] As the court in *Wiley* observed, *Ramos* "expressly reserved to the individual states the right to determine what post-sentencing matters are properly placed before a jury." *Id.* at 761-762.

[36] In reaching its decisions in *Wiley* and *Williams,* the court placed great reliance upon its prior decision in *Howell* v. *State* (Miss. 1982), 411 So. 2d 772. In *Howell,* the prosecuting attorney stated five times in closing argument that the jury's verdict was not final, and that the defendant would have the opportunity to seek appellate review. When the statement was first made it was objected to by defense counsel and sustained by the court. Nevertheless, the prosecuting attorney repeated the statement four additional times over defense counsel's objections. In addition, the prosecuting attorney *incorrectly* stated that "if he appeals * * * he [the defendant] has the right to be out on bond * * *." *Id.* at 773. Upon these facts, the court in *Howell* concluded that the defendant did not receive a fair trial.

Aside from the egregious conduct of the prosecutor in repeatedly making a statement which was objected to and sustained, thus denying the defendant a fair trial, the *Howell* case is also distinguishable from the instant cause in view of the prosecutor's inaccurate statements of the law and references to appellate review.

somehow provides greater protection against these remarks than the protections afforded under the Eighth and Fourteenth Amendments as discussed in *Ramos*.[37] Instead, we find persuasive the rationale of Justice Roy N. Lee in his dissent in *Wiley,* where he stated:

"I think that we must examine each record as it comes before us to determine whether or not on that record the * * * [defendant] has received a fair trial and, on the particular point here, whether or not remarks or statements * * * have resulted in prejudice to * * * [the defendant] to the extent that he did not obtain a fair trial." *Id.* at 765.

Having examined the trial court's charge to the jury herein, it is readily apparent that the portion of the charge to the jury under consideration was an accurate and correct statement of Ohio law,[38] in accordance with *Ramos*. Accordingly, the jury in the penalty phase of a capital prosecution may be instructed that its recommendation to the court that the death penalty be imposed is not binding and that the final decision as to whether the death penalty shall be imposed rests with the court, so long as such instruction does not result in a prejudice denying the defendant a fair trial. Upon examination of the entire record, we conclude that the charge did not result in a prejudice to the appellant which requires that he be resentenced.

## VII

We turn now to our review of the sentencing phase of appellant's trial. R.C. 2929.05(A) defines the scope of our review where the penalty of death has been imposed, and provides in part:

"* * * [T]he court of appeals and the supreme court shall upon appeal review the sentence of death at the same time that they review the other issues of the case * * * shall review the judgment in the case and the sentence of death imposed * * * shall review and independently weigh all of the facts and other evidence disclosed in the record * * * consider the offense and the offender to determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in the case, and whether the sentence of death is appropriate. In determining whether the sentence of death is appropriate, the court of appeals and the supreme court shall consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases. They shall also review all of the facts and other evidence to determine if the evidence supports the finding of the aggravating circumstances the trial jury or the panel of three judges found the offender guilty of com-

---

[37] On remand from the Supreme Court's decision in *Ramos,* the Supreme Court found the Briggs Instruction to be violative of the Due Process Clause of the California Constitution. See *People* v. *Ramos* (1984), 37 Cal. 3d 136, 207 Cal. Rptr. 800, 689 P. 2d 430. The court concluded that the instruction invites the jury to improperly speculate upon the actions of the present or future Governor when considering whether to impose a sentence of death.

[38] See fns. 32 and 33, *supra.*

mitting, and shall determine whether the sentencing court properly weighed the aggravating circumstances the offender was found guilty of committing and the mitigating factors."

For purposes of establishing factors in mitigation, three witnesses testified and appellant made a statement on his own behalf.

The first witness to testify for purposes of mitigation was Dr. Sandra B. McPherson, a clinical psychologist. Her testimony was based upon her professional evaluation of appellant which included psychological testing and personal interviews. McPherson testified that appellant had an I.Q. of 63 and a mental age of 9.5 years. At this intellectual range, she testified that appellant could be classified as "educable mentally retarded." McPherson testified that although appellant's I.Q. was in the stated range, he "could be expected to learn those materials which are necessary for survival in the society and would be able to read and write, for example, although the expectation would be that performance would not exceed a sixth grade level." Upon cross-examination, she admitted that appellant's intellectual capacity did not preclude him from being able to consider the import of his conduct or refrain from shooting upon realizing the police had arrived at the scene of the bank robbery.

Appellant's wife and mother also testified at the sentencing hearing. They both testified as to their perceptions that appellant was of below average intelligence. In addition, appellant's mother testified that during childhood appellant was subject to abuse from an alcoholic father and was given little guidance because his parents were infrequently home. McPherson testified that the lack of a supportive home environment could have prevented appellant from developing his intellectual capabilities. She did not suggest that appellant had any aggressive tendencies as a result of abuse during childhood.

Appellant's wife also testified that appellant was unable to tend to his own personal hygiene and likely to seek leadership from her as well as from others he knew. Although specific testimony as to alleged threats against her by Jordan was precluded, Loretta Jenkins testified that shortly before the offense appellant's attitude had changed and he was much more protective of her.

Appellant also made a statement in his own behalf, to the effect that he was remorseful and that he only became involved in the robbery as the result of coercion by Jordan.

Based upon this evidence, the trial judge specifically enumerated and considered the following factors in mitigation:

"(1) The nature and circumstances of the offense, the history, character and background of the defendant, Leonard Jenkins;

"(2) The defendant's level of intelligence and how that affected his judgment to get involved in the criminal activity;

"(3) The defendant's level of intelligence and how that affected his judgment inside and outside the bank on the day of the offense, to-wit: October 21, 1981;

"(4) The defendant's relative chronological and psychological age;

"(5) The defendant's family upbringing and whether that affected his ability to make decisions and to project into the future;

"(6) That while the defendant, Leonard Jenkins, did not act in self-defense, his conduct was prompted by the natural instinct of self-preservation;

"(7) That the defendant, Leonard Jenkins, was caused to act as he did as a result of an implied threat upon the life of the defendant's wife, Loretta Jenkins;

"(8) That the defendant, Leonard Jenkins' course of conduct on October 21, 1981, was not the product of careful decision-making and prolonged deliberation of all the information available to him and was without great intellectual insight."

The court considered items two, three and four together, all of which concerned the effect of appellant's low intelligence as a mitigating factor. In this regard, the court noted that appellant's intellectual capacity was not such as to render him incapable of forming intent or realizing the import of his conduct. In determining the weight to be given the evidence of appellant's low intelligence, the court considered appellant's conduct during the bank robbery. It was established that during the robbery, appellant unilaterally, and without direction from Jordan, disarmed the bank's security guard and held the tellers and customers at gunpoint while Jordan proceeded to collect money from the tellers' cash drawers. The trial court stated in its opinion, "* * * eighteen witnesses testified as to Leonard Jenkins' conduct in the bank during the course of the bank robbery, and everyone in effect pictured him as an aggressive, take-charge type of bank robber, waving a cocked gun and threatening the tellers with obscenities. Not one described him as a meek, submissive, dull-witted, overgrown boy being led or directed by a dominating associate through the intricate procedures of robbing a bank."

Moreover, when the police appeared at the door of the bank, several witnesses testified that appellant made statements to the effect that the police were there and that he would shoot his way out. He then proceeded to do just that while Jordan calmly surrendered.

The court concluded that it found no "* * * direct or positive correlation between the defendant's I.Q. * * * and his ability to successfully rob a bank and his responsibility for killing a police officer while effectuating his escape."

The court also considered items one and five together which considered appellant's background, including his family upbringing, and character. The evidence relevant to these factors was largely the testimony of appellant's wife and mother, whose objectivity the judge questioned. Moreover, since most of their testimony involved their perceptions of appellant's low intelligence and characterization of him as a follower, that was also discounted in view of his conduct during the robbery. Similarly, appellant's childhood experiences were given little weight

because the testimony established that their only effect was to contribute to appellant's low intelligence. The court noted that no psychological testimony linked appellant's involvement in a bank robbery and shooting to attitudes of hostility or aggression he acquired as the result of an abusive childhood.

The court attributed no weight to appellant's remaining claims. The fact that he acted out of a natural instinct of self-preservation was rejected in view of the fact that appellant created the danger himself by engaging in an armed bank robbery. The suggestion that appellant's wife had been threatened by Jordan was not supported by any credible evidence and the fact that the killing was not the result of prolonged deliberation was considered irrelevant.

In view of the trial court's extensive review of the factors in mitigation, appellant's contention that the trial court failed to consider his low I.Q. is without merit. That factor was fully considered by the trial court, but given minimal weight.

The court of appeals similarly considered all of the mitigating evidence, giving little weight to the claim that appellant's low intelligence was a significant mitigating factor. In reaching this result, it relied primarily on the evidence of appellant's assertive behavior during the robbery without direction from Jordan. It also concluded that the testimony of appellant, his wife and his mother lacked credibility.

We conclude that the trial court and court of appeals properly considered all of the evidence in mitigation. Moreover, we agree with their evaluation of that evidence. The import of all the evidence in mitigation was to suggest that appellant lacked the intellectual capacity to voluntarily and actively participate in an armed bank robbery and purposefully murder a police officer to effectuate his escape. It portrayed appellant as a passive individual incapable of acting independently. The evidence belies this contention. Despite a low I.Q., appellant demonstrated that he could disarm a bank guard and immobilize all of the tellers and patrons in the bank by threat of force. He clearly intended to fire his weapon and was fully aware that the person at whom he directed his shots was a police officer. There was no evidence to suggest that appellant's low intelligence distorted the decision-making processes he employed in perpetrating this robbery and murder, which would mitigate against the punishment imposed.

Our review is not completed, however, by a review of the evidence in mitigation and the manner in which it was considered by the courts below. We must also determine whether the aggravating circumstances appellant was found guilty of committing outweigh the mitigating factors beyond a reasonable doubt.

Our analysis turns first to the fact that, for the reasons stated in Part V, *supra,* the courts below improperly considered two of the five aggravating circumstances. As a result of the merger previously discussed,

only three aggravating circumstances should have been considered in the sentencing decision below. These are first, that the offense was part of a purposeful killing of, or attempt to kill, two or more persons; second, that the victim of the aggravated murder was a peace officer whom the defendant knew to be such, and who was engaged in his duties at the time; and third, that the defendant committed the aggravated murder while he was committing or fleeing immediately after committing or attempting to commit aggravated robbery.

This error cannot be treated superficially. Ohio law provides that at each level of proceedings the aggravating circumstances must be weighed against the mitigating factors and only where the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt may the penalty of death be imposed. R.C. 2929.04 and 2929.05.

The United States Supreme Court has held that the improper consideration of an aggravating circumstance by the sentencer does not necessarily invalidate the imposition of a sentence of death. *Zant* v. *Stephens, supra; Barclay* v. *Florida, supra.* In each case, the sentencing court considered an improper aggravating circumstance which the state's highest courts held did not require vacation of the death penalty. In each case, the United States Supreme Court held that review of such a defect required an inquiry into "* * * the function of the finding of aggravating circumstances under * * * [state] law and * * * the reason why this aggravating circumstance is invalid." *Barclay, supra,* at 1145; *Zant, supra,* at 241-242.

The statutory framework in Florida discussed in *Barclay* is similar to Ohio's. Like in Ohio, the statute precluded consideration of non-statutory aggravating circumstances and required the sentencing court to weigh the mitigating factors against the aggravating circumstances. *Id.* at 1146.[39] In *Barclay,* at 1148, the court stated:

"The crux of the issue, then, is whether the trial judge's consideration of this improper aggravating circumstance so infects the balancing process created by the Florida statute that it is constitutionally impermissible for the Florida Supreme Court to let the sentence stand."

In *Barclay,* the sentencing court considered the defendant's criminal record as an aggravating circumstance although it was not defined as such by statute. In upholding the imposition of the death penalty despite the consideration of the improper aggravating circumstance, the court was persuaded by the fact that the evidence of the defendant's record was otherwise admissible (*id.*), and that in reviewing similar errors, the Florida Supreme Court did not mechanically apply a harmless error analysis (*id.* at 1147).

---

[39] The Georgia statute at issue in *Zant, supra,* did not prohibit consideration of non-statutory aggravating circumstances and did not require the sentencing court to weigh the aggravating circumstances against the mitigating factors.

In the case at bar, evidence of the two duplicative aggravating circumstances was admissible for purposes of the guilt phase of trial. Moreover, the same evidence which established the duplicative aggravating circumstances also establishes one of the remaining aggravating circumstances, *i.e.*, that the offense occurred during the commission of or upon fleeing from an aggravated robbery. Indeed, the two circumstances have been merged as being duplicative (see Part V, *supra*), as opposed to being constitutionally or statutorily invalid.

We also note that only one aggravating circumstance need be proven to subject appellant to the possibility of a sentence of death. Here, despite our merger, three aggravating circumstances remain which have been proven beyond a reasonable doubt. In view of our determination, as well as that of the courts below, that the mitigating factors do not outweigh the aggravating circumstances, we cannot conclude that the merger of two aggravating circumstances would have affected the balance struck by the courts below so as to require the vacation of the death penalty. To the contrary, we find that the three aggravating circumstances appellant was found guilty of committing outweigh, beyond a reasonable doubt, any evidence offered by way of mitigation.

## VIII

R.C. 2929.05 requires this court and the court of appeals to determine whether the sentence of death is disproportionate to sentences imposed for similar crimes. This type of proportionality review "* * * purports to inquire * * * whether the penalty is nonetheless unacceptable in a particular case because [it is] disproportionate to the punishment imposed on others convicted of the same crime." *Pulley* v. *Harris, supra,* at 36. While statutory schemes employing proportionality review provisions have been favorably endorsed by the United States Supreme Court, they are not constitutionally mandated. *Id.* at 40.

To aid the courts in conducting their proportionality review under R.C. 2929.05, R.C. 2929.021[40] requires that certain information be pro-

---

[40] R.C. 2929.021 provides:

"(A) If an indictment or a count in an indictment charges the defendant with aggravated murder and contains one or more specifications of aggravating circumstances listed in division (A) of section 2929.04 of the Revised Code, the clerk of the court in which the indictment is filed, within fifteen days after the day on which it is filed, shall file a notice with the supreme court indicating that the indictment was filed. The notice shall be in the form prescribed by the clerk of the supreme court and shall contain, for each charge of aggravated murder with a specification, at least the following information pertaining to the charge:

"(1) The name of the person charged in the indictment or count in the indictment with aggravated murder with a specification;

"(2) The docket number or numbers of the case or cases arising out of the charge, if available;

"(3) The court in which the case or cases will be heard;

"(4) The date on which the indictment was filed.

vided to the Ohio Supreme Court with respect to capital indictments issued or dismissed. Also, under R.C. 2929.03(F), trial judges rendering opinions in capital cases are required to file copies of those opinions with their court of appeals and with the Ohio Supreme Court. R.C. 2929.05(A) also requires courts of appeals to file copies of their sentencing opinions with the Ohio Supreme Court. The purpose of these provisions is to provide the reviewing courts with some basis for reviewing the proportionality of the imposition of the death sentence in comparison with sentences entered in similar cases.

The court of appeals held that "* * * [t]he burden rests on counsel for the parties to advise this court about other cases from this district with which comparison is requested. This court has no duty to make independent investigative efforts in search of comparable or disparate sentences." This ruling is incorrect in light of the statutory framework just discussed for proportionality review. R.C. 2929.05 requires the review of the proportionality of death sentences regardless of whether counsel has provided evidence of disproportionality. Moreover, the court of appeals is required to determine for itself whether the sentence is disproportionate, at least when compared with those sentencing opinions filed with the court of appeals and the court of appeals' own prior decisions. This is the purpose for the statutory requirement that data relevant to other sentences imposed must be provided to the court of appeals.

Appellant urges that the judgment should be reversed in order for the court of appeals to conduct proportionality review and also to consider, in making that determination, the relative sentences imposed in non-capitally charged murder cases. R.C. 2929.05 does not require a comparison of sentences in non-capital murder cases for proportionality review, nor is a similar requirement imposed by the United States Constitution. See *Pulley* v. *Harris, supra.*

As to appellant's first request, the court of appeals' erroneous statements regarding proportionality review do not appear to warrant a

"(B) If the indictment or a count in an indictment charges the defendant with aggravated murder and contains one of more specifications of aggravating circumstances listed in division (A) of section 2929.04 of the Revised Code and if the defendant pleads guilty or no contest to any offense in the case or if the indictment or any count in the indictment is dismissed, the clerk of the court in which the plea is entered or the indictment or count is dismissed shall file a notice with the supreme court indicating what action was taken in the case. The notice shall be filed within fifteen days after the plea is entered or the indictment or count is dismissed, shall be in the form prescribed by the clerk of the supreme court, and shall contain at least the following information:

"(1) The name of the person who entered the guilty or no contest plea or who is named in the indictment or count that is dismissed;

"(2) The docket numbers of the cases in which the guilty or no contest plea is entered or in which the indictment or count is dismissed;

"(3) The sentence imposed on the offender in each case."

reversal where this court must, under R.C. 2929.05, reconsider the issue of proportionality.

Since this is the first case we have reviewed under our death penalty statutes, we have no prior decisions for comparison. However, we have reviewed the sentencing opinions filed with this court and conclude that the penalty herein was not disproportionate to that imposed in similar situations.

In his argument that the sentence imposed herein was disproportionate appellant relies on statistical data that out of two hundred eighty capital indictments filed since the enactment of the death penalty statutes, only ten percent have led to the imposition of the death penalty. While this statistical data is of limited value for any purpose at this early stage in reviewing the imposition of the death penalty, we would derive the opposite conclusion from this data. We would construe it as demonstrating a conscious and serious effort by local jurisdictions to narrowly define the class of persons subject to the death penalty.

There is nothing which we have discovered in our review of death sentences imposed or raised in appellant's brief which suggests that the sentence in this case was imposed arbitrarily or freakishly as condemned in *Furman* v. *Georgia, supra* (408 U.S. 238).

IX

Appellant also challenges the trial court's instructions to the jury as to the state's burden of proof at both the guilt and penalty phases of trial. Appellant first argues that in a capital case, the state's burden should be "proof beyond all doubt" and that the jury must be so instructed. This argument is without merit. R.C. 2901.05(A) defines the burden of proof in all criminal proceedings and provides that "[e]very person accused of an offense is presumed innocent until proven guilty beyond a reasonable doubt, and the burden of proof for all elements of the offense is upon the prosecution." With particular reference to imposition of the death penalty, R.C. 2929.03(B) requires that the jury be instructed "* * * that a specification shall be proved beyond a reasonable doubt in order to support a guilty verdict on the specification * * *." Similarly, R.C. 2929.03(D)(1) provides that "* * * [t]he prosecution shall have the burden of proving, by proof beyond a reasonable doubt, that the aggravating circumstances the defendant was found guilty of committing are sufficient to outweigh the factors in mitigation of the imposition of the sentence of death." See, also, R.C. 2929.03(D)(2).

The constitutionality of requiring a burden of proof beyond a reasonable doubt in criminal proceedings has been firmly established. *In re Winship* (1970), 397 U.S. 358, 364 [51 O.O.2d 323]. There is no authority which holds that appellant's proposed burden of "proof beyond all doubt" is constitutionally mandated.

In its instructions to the jury, the trial court employed the definition of "reasonable doubt" contained in R.C. 2901.05(D) which provides:

" 'Reasonable doubt' is present when the jurors, after they have carefully considered and compared all the evidence, cannot say they are firmly convinced of the truth of the charge. It is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. 'Proof beyond a reasonable doubt' is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs."

Appellant argues that the statutory definition is inadequate and fails to convey the concept of reasonable doubt required by *In re Winship, supra.* We addressed an identical argument with respect to the language in R.C. 2901.05(D) in *State v. Nabozny* (1978), 54 Ohio St. 2d 195, 202-203 [8 O.O.3d 181], stating:

"* * * We are cognizant of the difficulty inherent in any attempt to define this abstract legal concept. The United States Supreme Court recognized this problem in *Miles v. United States* (1880), 103 U.S. 304, at page 312: 'Attempts to explain the term "reasonable doubt" do not usually result in making it any clearer to the minds of the jury.' Scrutiny of the definition provided by the General Assembly in R.C. 2901.05 reveals a substantial similarity to the explanation of 'reasonable doubt' upheld in *Holland v. United States* (1954), 348 U.S. 121. In *Holland, supra,* at page 140, the United States Supreme Court found, concerning 'reasonable doubt,' that 'the instruction as given was not of the type that could mislead the jury into finding no reasonable doubt when in fact there was some. * * *'

"The General Assembly has attempted, in R.C. 2901.05 and the definition of 'reasonable doubt' therein, to provide not only a degree of consistency as to the meaning of the term throughout the courts of this state, but also to have a definition comprehensible to all the members of the jury and not merely those trained in the subtle nuance of legalese. Considering the inherent difficulty in defining this abstract concept of reasonable doubt, the similarity of the definition under consideration with that in *Holland, supra,* and the beneficial aspects of the legislative mandated definition, we find that the General Assembly has pronounced a rational definition of 'reasonable doubt' which, when taken as a whole, correctly conveyed the concept of 'reasonable doubt' to the jury." (Footnote omitted.)

Consequently, the standard of proof in a capital prosecution is proof beyond a reasonable doubt as defined in R.C. 2901.05 and not proof beyond all doubt.

## X

Appellant next claims his due process rights were violated because the jury was not required to render a specific finding on the question of intent to kill at the guilt phase of the trial.[41]

Appellant argues that the plain language of R.C. 2903.01(D) requires a specific finding by the jury that "[n]o person shall be convicted of aggravated murder unless he is specifically found to have intended to cause the death of another. * * *" The obvious purpose underlying this provision, however, is to avoid situations found so objectionable by the United States Supreme Court in *Lockett* v. *Ohio, supra* (438 U.S. 586), and *Enmund* v. *Florida, supra* (458 U.S. 782). In those cases, the defendants were sentenced to death even though they did not participate in the actual killing, lacked the specific intent to kill, and acted only as aiders and abettors to crimes other than murder. Consequently, we find that R.C. 2903.01(D) does not support appellant's claim.

Appellant alternatively contends that even if Ohio's aggravated murder statute is not found to expressly mandate a special verdict, that a special verdict must necessarily be implied.

This court has stated that "the function of the courts in reference to legislative enactments is to declare their meaning from what they say and not to interpret them in reference to what the courts may think they ought to say." *DeLong* v. *Campbell* (1952), 157 Ohio St. 22, 29 [47 O.O. 27].

That a special verdict was not within legislative contemplation is quite evident. At the time the General Assembly enacted R.C. 2903.01(D), it also passed R.C. 2929.03, which requires special findings by the jury with respect to aggravating circumstances. Where the legislature, in definitive language, provides for a special verdict in one statute and fails to so provide in another contemporaneously enacted statute, we can only conclude that no special verdict is required in the latter statute. In *Bernardini* v. *Bd. of Edn.* (1979), 58 Ohio St. 2d 1, at 4 [12 O.O.3d 1], we said: "In ascertaining the legislative intent of a statute, 'It is the duty of this court to give effect to the *words used* [in a statute], not to delete words used *or to insert words not used.*' * * *" (Emphasis *sic.*) To adopt appellant's theory would effectively insert words not used into R.C. 2903.01(D). It follows then, that since no special "intent to kill" verdict is called for in Ohio's capital punishment scheme, none is required.

---

[41] It is true, as appellant points out, that criminal statutes are to be "strictly construed against the state, and liberally construed in favor of the accused." R.C. 2901.04(A). And, appellant's contention about the jury's determination is also correct, *i.e.,* that "[t]he existence of an accused's purpose to kill must be found by the jury under proper instructions from the trial court and can never be determined by the court as a matter of law." *State* v. *Scott* (1980), 61 Ohio St. 2d 155 [15 O.O.3d 182], paragraph four of the syllabus. But, appellant makes no particular claim that the jury was not properly instructed with respect to this issue; neither is there any evidence that appellant's intent was determined by the court as a matter of law.

Accordingly, a capital defendant is not entitled to a special verdict on the question of intent to kill at the guilt phase of a capital prosecution.

## XI

Appellant's next complaint focuses upon the trial court's jury instructions and jury form, utilized during the sentencing phase. While instructing the jury at the conclusion of the sentencing phase, the trial judge stated:

"After you retire, first select a foreman or forelady, and whenever all twelve of you — I repeat — all twelve jurors agree upon a verdict, you will sign the verdict in ink and advise the court of this fact. That applies to all verdict forms."

Subsequent to this charge, two verdict forms were provided to the jurors. One form provided for the sentence of death, and contained twelve signature lines. The other form provided for a life sentence with a blank space for the jury to impose either twenty or thirty years of imprisonment without parole. This form also contained twelve signature lines.

Appellant maintains that the trial court erroneously instructed the jury that unanimity was required in order to return a verdict imposing a life sentence. Appellant predicates this argument primarily upon his construction of R.C. 2929.03(D)(2) which provides, in relevant part:

"If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender. Absent such a finding, the jury shall recommend that the offender be sentenced to life imprisonment with parole eligibility after serving twenty full years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment."

In the first sentence above, referring to the imposition of a sentence of death, the statute requires a unanimous jury finding. However, when referring to the imposition of a life sentence, neither unanimity nor any other percentage of jurors is set forth. Appellant interprets this omission to mean that if the jury cannot unanimously agree on death, then the jury may return a life sentence absent unanimity. We disagree. The fallacy which immediately emerges under appellant's construction of R.C. 2929.03(D)(2) is that if something less than unanimity is allowed in returning a life sentence, what percentage will suffice?

The state, on the other hand, contends that any ambiguity present within R.C. 2929.03(D)(2) is easily resolved under Crim. R. 31(A). An examination of this rule, when read in conjunction with the foregoing statute, demonstrates that the state's contention is well-taken.

Crim. R. 31(A) provides:

"The verdict shall be unanimous. It shall be in writing, signed by all

jurors concurring therein, and returned by the jury to the judge in open court."

Application of the foregoing rule to the cause *sub judice* resolves any ambiguity raised by appellant under R.C. 2929.03(D)(2), and is, without question, consistent with the scope and applicability of the Rules of Criminal Procedure.[42] Moreover, absent the application of Crim. R. 31(A), it is, nevertheless, well-recognized that when statutes allow a jury in a criminal proceeding to influence punishment, such as the recommendation of life imprisonment in place of death, and the statute fails to expressly authorize a nonunanimous vote, the jury cannot secure the lesser punishment absent unanimity. See Annotation (1965), 1 A.L.R. 3d 1461, at 1462.

Accordingly, we conclude that in returning a sentence of life imprisonment under R.C. 2929.03(D)(2), the jury's verdict must be unanimous.

## XII

Appellant next contends that "[i]n the penalty phase of a capital case, the defendant shall have the right to open and close the final arguments because a capital defendant actually has the affirmative on the issue of whether he should be sentenced to death." Appellant bases this claim on R.C. 2929.03(D)(1),[43] which states, in pertinent part, that "[t]he defendant shall have the burden of going forward with the evidence of any factors in mitigation of the imposition of the sentence of death." Appellant further contends that R.C. 2315.01(C)[44] and 2315.01(F)[45] give him the right to open and close because he would be "[t]he party who would be defeated if no evidence were offered on either side." The state, on the other hand, argues that it should open and close final arguments during the penalty phase because R.C. 2929.03(D)(1) provides that the "prosecution shall

---

[42] Crim. R. 1, which sets forth the scope and applicability of the Rules of Criminal Procedure, provides in relevant part:

"(A) These rules prescribe the procedure to be followed in all courts of this state in the exercise of criminal jurisdiction, with the exceptions stated in subdivision (C) of this rule."

The seven exceptions enumerated in subdivision (C) are clearly inapplicable to the present case.

[43] R.C. 2929.03(D)(1) provides in part:

"The defendant shall have the burden of going forward with the evidence of any factors in mitigation of the imposition of the sentence of death. The prosecution shall have the burden of proving, by proof beyond a reasonable doubt, that the aggravating circumstances the defendant was found guilty of committing are sufficient to outweigh the factors in mitigation of the imposition of the sentence of death."

[44] R.C. 2315.01(C) provides:

"The party who would be defeated if no evidence were offered on either side, first, must produce his evidence, and the adverse party must then produce his evidence."

[45] R.C. 2315.01(F) provides in part:

"* * * The party required first to produce his evidence shall have the opening and closing arguments. * * *"

have the burden of proving, by proof beyond a reasonable doubt, that the aggravating circumstances the defendant was found guilty of committing are sufficient to outweigh the factors in mitigation of the imposition of the sentence of death."

In the case *sub judice,* at the conclusion of the penalty phase of the trial, the court permitted the state to open and close final arguments to the jury. We find no error in this for the following reasons.

R.C. 2945.10(F) provides that: "[w]hen the evidence is concluded * * * the counsel for the state shall commence, the defendant or his counsel follow, and the counsel for the state conclude the argument to the jury."

As stated in the third paragraph of the syllabus in *State* v. *Bayless, supra:* "Any decision to vary the order of proceedings at trial in R.C. 2945.10 is within the sound discretion of the trial court, and any claim that the trial court erred in following the statutorily mandated order of proceedings must sustain a heavy burden to demonstrate the unfairness and prejudice of following that order." Appellant has not met this burden.

We agree with appellant's assertion that the state cannot, in the sentencing phase, present proof of aggravating factors other than those of which the appellant was found guilty of committing in the guilt phase of the trial. R.C. 2929.03(D)(1). However, by that same statute, the "prosecution shall have the burden of proving, by proof beyond a reasonable doubt, that the aggravating circumstances * * * outweigh the factors in mitigation of the imposition of the sentence of death." Therefore, because the state carries the burden of proof, we hold that it has the right to open and close during final arguments to the jury.

In *State* v. *Bayless, supra,* we found that any decision to deviate from the statutorily mandated order of a trial rests within the sound discretion of the trial judge. In light of that holding, we find these words of the Court of Appeals for Lawrence County most appropriate: "A defendant in a criminal case does not have the right to control the trial court in the use of its discretion to choose the means under law by which an accused will be tried. Such defendant cannot successfully insist on some procedure he thinks would give him a better chance of minimizing the punishment he might receive * * *."[46] Accordingly, the trial court did not err in allowing the prosecution to open and close final argument in the penalty phase of this proceeding.

## XIII

Appellant next contends he was denied a fair trial because the state violated an order *in limine* and made prejudicial comments relative to appellant's unsworn statement to the jury.

Before commencement of the penalty phase of the trial, appellant's counsel filed a motion *in limine* to prohibit the prosecution from comment-

---

[46] *State* v. *Wilson* (1971), 26 Ohio App. 2d 23, 28 [55 O.O.2d 47].

ing on appellant's exercise of the option to make an unsworn statement to the jury and that he not be subject to cross-examination. R.C. 2929.03(D).[47]

The motion was granted. While the court considered the motion, the prosecutor said, "The State has no intention of commenting upon the fact he is making an oral statement and that, specifically, he was not under oath, and that specifically, we did not have the right to cross-examine * * *." Notwithstanding this pledge, however, the prosecutor, in closing argument, said, "Let me make a note of something else while I talk about that statement [of Jenkins]. You notice, ladies and gentlemen, that throughout this trial, this part, as well as the previous part, their witnesses' came in and the witness took the oath —."

The defense promptly objected and the objection was sustained. A contemporaneous motion for mistrial was denied. The court warned the prosecutor to abandon the argument and then instructed the jury to disregard the prosecutor's comments.

The appellant asserts that his motion for a mistrial should have been granted and relies heavily on the case of *Johnson* v. *United States* (1942), 318 U.S. 189, to support this contention. In that case, the defendant had taken the stand in his own defense, had answered the questions put to him by his counsel, and had answered some questions by the government's attorney. As to certain questions, however, the defendant asserted his Fifth Amendment right against self-incrimination. The trial judge permitted this selective-answer procedure. In closing argument, the prosecutor commented on the defendant's claim to the constitutional right. On review, the Supreme Court found that allowing the defendant to choose which questions he would answer once he had taken the stand was improper. But, the court stated: "Where the claim of privilege is asserted and unqualifiedly granted, the requirements of fair trial may preclude any comment [by the prosecution]." *Id.* at 196.

Appellant further argues that the prosecutor's statements constituted a violation of the rule established by *Griffin* v. *California* (1965), 380 U.S. 609, and adopted by this court in *State* v. *Lynn* (1966), 5 Ohio St. 2d 106, paragraph one of the syllabus: "Comment by the trial court or by the prosecutor upon the failure of an accused to testify in a criminal proceeding against him violates the self-incrimination clause of the Fifth Amendment made applicable to the states by the Fourteenth Amendment."

The cases cited by appellant in support of his claim are inapposite. All three decisions deal with situations where defendants exercised the constitutional right to remain silent. Appellant, however, did not choose to remain silent. He exercised his option to speak.

---

[47] R.C. 2929.03(D)(1), provides, *inter alia,* that the jury in the sentencing phase of the trial, shall hear any statements by the offender relative to the penalty issue. Further, that section states, "* * * If the offender chooses to make a statement, he is subject to cross-examination only if he consents to make the statement under oath or affirmation."

In *Johnson* v. *United States, supra,* the United States Supreme Court condemned comments by the prosecutor relative to those questions the defendant refused to answer pursuant to the Fifth Amendment.[48] Likewise, in the decisions of *Griffin* v. *California, supra,* and *State* v. *Lynn, supra,* the defendants chose to remain silent, only to have their silence used against them. In those cases, as we have said, remarks by the prosecutor concerning a defendant's right to silence were found to contravene Fifth Amendment guarantees.

In the case *sub judice,* appellant claims that the prosecutor's agreement not to comment misled him into exercising his right to make the unsworn statement. Appellant says he relied on the prosecutor's assurances to his detriment and that he suffered prejudice because the prosecutor later made remarks that the prosecutor had said he would not make. We perceive no prejudice here. The prosecutor said nothing more than what the jury already knew to be true, namely, that all other defense witnesses testified under oath and that appellant did not. So, even though the prosecutor failed to keep his word and violated the order *in limine,* under the circumstances here, we find his utterances harmless and completely innocuous. First, his observations were not directed to any failure by appellant to testify. Second, the prosecutor's comments were limited to the fact that unlike other witnesses, the statement of appellant was not made under oath. Third, the trial judge warned the prosecutor not to proceed further in his statements. And fourth, any prejudicial effect was minimized by the court's instructions to the jury to disregard the prosecutor's comments.[49]

In view of the foregoing, appellant's contention is meritless.

## XIV

Appellant claims that the trial court erroneously refused to instruct the jury on the lesser included offense of manslaughter. He asserts the court's failure to so instruct "* * * diminished the reliability of the guilt determination and enhanced the risk of an unwarranted conviction in derogation of appellant's rights guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution."

---

[48] The *Johnson* case is distinguishable for other reasons as well. In *Johnson*, the defendant was under oath, he was questioned by his own attorney, and answered some of the prosecution's questions on cross-examination. In the case at bar, appellant took the stand, but was not under oath. He was not examined by defense counsel, and was not subjected to cross-examination by the state.

[49] It is to be noted that we are not dealing here with substantial and extensive prosecutorial misconduct repudiated by this court in *State* v. *Smith* (1984), 14 Ohio St. 3d 13, *State* v. *Henry* (1983), 4 Ohio St. 3d 44, and *State* v. *Liberatore* (1982), 69 Ohio St. 2d 583 [23 O.O.3d 489]. In this case, the prosecutor's remarks were incidental and isolated. Given the wide latitude afforded counsel in summation, and the fact that the court took prompt corrective action, we cannot discern any harm to appellant.

In Ohio, "if lesser offenses are included within the offense charged, the defendant may be found not guilty of the degree charged but guilty of an inferior degree thereof, or of a lesser included offense." Crim. R. 31(C); R.C. 2945.74.

The primary difference between involuntary manslaughter and aggravated murder is the offender's intent. See, *e.g.* the first sentence of paragraph two of the syllabus in *State* v. *Johnson* (1983), 6 Ohio St. 3d 420, reversed on other grounds (1984), ___ U.S. ___, 81 L. Ed. 2d 425. A conviction for aggravated murder is warranted where the accused "purposely cause[s] the death of another while committing * * * aggravated robbery or robbery * * *." R.C. 2903.01(B). For involuntary manslaughter the killing need only occur "as a proximate result of * * * committing or attempting to commit a felony." R.C. 2903.04(A).

In *State* v. *Loudermill* (1965), 2 Ohio St. 2d 79 [31 O.O.2d 60], syllabus, we held: "Where the evidence in a criminal case would support a finding by the jury of guilt of a lesser offense included in the offense for which defendant was indicted and tried, the refusal of the trial court to charge upon that lesser included offense is error prejudicial to the rights of defendant." Later cases, however, have shown that the *Loudermill* rule is not absolute. For example, in *State* v. *Wilkins* (1980), 64 Ohio St. 2d 382 [18 O.O.3d 528], at 387, we commented that, "[t]he mere fact that an offense can be a lesser included offense of another offense does not mean that a court must instruct on both offenses where the greater offense is charged." The policy underlying this, the court noted, is that "juries were not to be presented with compromise offenses which could not possibly be sustained by the adduced facts." *Id.*

In *State* v. *Nolton* (1969), 19 Ohio St. 2d 133, at 135 [48 O.O.2d 119], we stated:

"* * * [I]f the trier could *reasonably* find against the state and for the accused upon one or more of the elements of the crime charged and for the state and against the accused on the remaining elements, which by themselves would sustain a conviction upon a lesser included offense, then a charge on the lesser included offense is both warranted and required, not only for the benefit of the state but for the benefit of the accused." (Emphasis *sic*.)

Finally, in *State* v. *Solomon* (1981), 66 Ohio St. 2d 214 [20 O.O.3d 213], the following was announced, at paragraph two of the syllabus:

"Where the evidence adduced on behalf of the defendant constitutes a complete defense to the substantive elements of the crime charged, an instruction on a lesser included offense should be given to the trier of fact only if, based on the evidence adduced by the state, the trier of fact can find for the defendant and against the state on some element of the greater offense which is not required to prove the commission of the lesser offense and for the state on the elements required to prove the commission of the lesser offense."

Under this rule, the burden is on the defendant, once the state has presented its evidence on the substantive elements of the crime charged, to show a defense to certain elements of that offense and thereby obtain an instruction to a lesser included offense. Elaborating further in the *Solomon* case, this court stated, at 220:

"* * * An offense becomes a lesser included offense of another for purposes of R.C. 2945.74[50] only if the trier of fact is presented with some evidence supporting a finding against the state and for the accused on an element of the greater offense which need not be shown to prove the lesser offense. In such a case an instruction on the lesser included offense is warranted. Juries must not be presented with unreasonable compromises. As we stated, at page 387, in *Wilkins, supra*:

" " "* * * Such unreasonable compromises are detrimental to both the state and the defendant. These compromises allow juries to lessen punishment at their unlimited discretion, even when they find the defendant guilty of the greater offense beyond a reasonable doubt. Further, they can allow juries to convict a defendant of a crime of which he is not guilty beyond a reasonable doubt with a clearer conscience than if only the greater offense were charged.' "

The facts of this case indicate that the trial court could not reasonably have found against the state on the issue of specific intent to kill. Ivan D. Wright, one of the tellers in the bank, testified that appellant told him, "If * * * [you] tremble * * * too hard * * * [I will] blow * * * [your] Mother fucking head off." He further testified that Jenkins told his accomplice that the police had arrived and that he (appellant) would "blow the mother fucker's head off." Appellant then turned and fired through the door. Kenneth M. Goetz, another prosecution witness, testified that appellant said, "The police are at the door. We are going to have to shoot our way out of here." Appellant then shot through the door. State's witness William C. Anderson told the court that appellant said something to the effect that he would "get" the officer just before firing through the door. According to Henry Browning, a security guard in the bank, appellant saw the police and said, "* * * we will have to shoot our way out," and then appellant fired through the glass doors. Numerous other state's witnesses testified similarly.

Although appellant offers some testimony to the contrary, the testimony of the witnesses establishes conclusively that the appellant possessed the intent to kill necessary to sustain a conviction for ag-

---

[50] In pertinent part, R.C. 2945.74 provides:

"The jury may find the defendant not guilty of the offense charged, but guilty of an attempt to commit it if such attempt is an offense at law. When the indictment or information charges an offense, including different degrees, or if other offenses are included within the offense charged, the jury may find the defendant not guilty of the degree charged but guilty of an inferior degree thereof or lesser included offense."

gravated murder. Consequently, the court could not have reasonably found against the state on this issue. It follows, then, that an instruction as to the lesser included offense of involuntary manslaughter was not warranted and not required. Consequently, appellant's contention that he was entitled to a charge on the lesser included offense of involuntary manslaughter lacks merit.

Appellant next contends that there was insufficient evidence as a matter of law to prove that he specifically intended to murder Officer Johnson and attempted to murder Officer Myhand.

Appellant erroneously assumes that the evidence relied upon to prove specific intent was mere circumstantial evidence. The words of the appellant himself, alluded to in our discussion of the previous issue, were enough to show that he possessed the specific intent to kill. Appellant's menacing threats, uttered inside the bank, constituted direct evidence of his state of mind and of his intentions. The credibility of this evidence is bolstered by the fact that he did what he threatened to do — he turned and fired through the doors of the bank where he knew the officers were about to enter. As aptly stated by the Illinois Court of Appeals: "[W]here a remark is made spontaneously and concurrently with an affray, * * * or the like, it carries with it inherently a degree of credibility * * * because of its spontaneous nature." *Carroll* v. *Guffey* (1959), 20 Ill. App. 2d 470, 475, 156 N.E. 2d 267, 270.[51] Moreover, ballistics testimony indicated that a bullet found near the deceased officer's body was identified as of a kind that only the appellant's gun could have fired.

With regard to the charge of attempted murder of Officer Myhand, appellant contends, essentially, that the fact that Myhand was not shot is evidence of appellant's lack of intent to kill him. However, a claim that no harm resulted to a potential victim is no defense to a charge of attempted murder. R.C. 2923.02(A), Ohio's attempt statute, refers to "conduct which, if successful, would constitute or result in the offense."[52] For a conviction on this offense, there is no requirement that the victim sustain an injury from the attempted act. The offender's intent is the key.

In finding against the appellant on this point, we again reiterate that "[a] reviewing court will not reverse a jury verdict where there is substantial evidence upon which a jury could reasonably conclude that all the elements of an offense have been proven beyond a reasonable doubt." *State* v. *Eley* (1978), 56 Ohio St. 2d 169 [10 O.O.3d 340], syllabus. We find

---

[51] This same principle also was well put by the Eighth Circuit Court of Appeals in *Picker X-Ray Corp.* v. *Frerker* (C.A. 8, 1969), 405 F. 2d 916, 922: "Statements made at the time of an act * * * have been regarded, because of their spontaneity, as inherently credible * * *."

[52] R.C. 2923.02(A) provides:

"No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct which, if successful, would constitute or result in the offense."

the necessary "substantial evidence" is present: the appellant made no secret of his intention to "blow the * * * [policeman's] head off." He then followed through by firing his gun at the officers. Appellant's stated intent, coupled with the act, ended in the death of one officer and an attempt to take the life of another. We therefore can only conclude that appellant intended this result. Appellant's claims as to the insufficiency of the evidence are devoid of merit.

## XV

Appellant next claims he was denied the effective assistance of counsel because the trial judge limited the time for presentation of closing arguments in both the guilt and sentencing portions of the trial.

In the guilt phase of the trial, thirty-six witnesses testified, the evidence was conflicting, and the ballistics and medical testimony was of a technical nature. Because the court allowed only one and one-half hours of the requested two and one-half hours for closing, appellant claims he suffered prejudice. Three witnesses testified in the penalty phase of the trial. Appellant does not say how much time was allotted or used, but complains that he was not afforded the full four hours he requested. Here again, appellant claims prejudice. In the face of these time limitations, appellant moved for a mistrial. The motion was overruled.

It is well-established that the time allowed for closing argument is within the sound discretion of the trial court. *Halsey* v. *State* (1932), 42 Ohio App. 291, 297, appeal dismissed (1932), 125 Ohio St. 628; *State* v. *Kay* (1967), 12 Ohio App. 2d 38, 49-52 [41 O.O.2d 91]; *United States* v. *Mills* (C.A. 6, 1966), 366 F. 2d 512, 515. The exercise of such discretion " '* * * will not be interfered with by an appellate tribunal in the absence of a clear showing of its abuse to the prejudice of the substantial rights of the complaining party. * * *' " *Braeunig* v. *Russell* (1960), 170 Ohio St. 444, 446 [11 O.O.2d 200]. In the *Braeunig* case, we further held that " '* * * [t]he only limitation upon the discretion of the court to limit the length of arguments, however, is that the time given must be reasonable and of such length as not to impair the right of argument or to deny a full and complete defense. * * *' " *Id.*

The latest pronouncement on this issue in Ohio appears in the case of *State* v. *Kay, supra,* at 49-50. There, the court of appeals acknowledged that " '[n]o precise rule can be laid down as to the time limit to which the trial court may properly restrict the argument of counsel, since what might be a reasonable limitation in one case would unquestionably be unreasonable in another. * * *' " From *Kay, supra,* at 49-52, we note five factors which are to be considered in determining whether a particular time limitation on closing argument constitutes an abuse of discretion: (1) the circumstances of the case, (2) the gravity of the offense, (3) the number of witnesses examined, (4) the volume of the evidence, and (5) the time consumed by the trial.

The trial judge here undoubtedly determined that the salient and essential features of the evidence and the applicable law could be fully presented without any prejudice to the appellant's rights within the time allotted.[53] Because we have examined appellant's claims on this issue, and because we find them unpersuasive, we conclude the trial court was correct in this determination. Appellant's right of argument was not impaired, nor was he denied a full and complete defense.

The Supreme Court of Michigan, in *Spalding* v. *Spalding* (1959), 355 Mich. 382, 384-385, 94 N.W. 2d 810, 811-812, commented in terms appropriate to this issue:

"[A]n abuse of discretion involves far more than a difference in * * * opinion * * *. The term discretion itself involves the idea of choice, of an exercise of the will, of a determination made between competing considerations. In order to have an 'abuse' in reaching such determination, the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias. So tested, we perceive no error in the proceedings below [on this issue] nor in the determination made."

Consequently, appellant's contention is without merit.

## XVI

Appellant next argues that the trial court abused its discretion in refusing to accept a change of plea to some counts in the indictment.

Appellant initially pled not guilty to all counts of the indictment. During the voir dire prior to trial, appellant requested to change his plea on fifteen counts of the indictment, specifically he sought to plead guilty to the eight counts of aggravated robbery and seven counts of kidnapping, and to plead no contest to the charge of possession of criminal tools. The state objected, arguing that appellant was attempting to create delay or provide a basis for potential collateral estoppel or double jeopardy arguments. The trial court refused to allow the change of plea.

R.C. 2943.03 provides in part: "* * * The court may, for good cause shown, allow a change of plea at any time before the commencement of the trial."

Crim. R. 11(C)(2) provides, in relevant part: "In felony cases the court may refuse to accept a plea of guilty or a plea of no contest * * *."

These provisions give the court discretion in determining whether to accept a change of plea.

Appellant concedes that he has no constitutional right to have his guil-

---

[53] Although the trial court originally granted appellant's request for four hours' time for argument in the penalty phase, we fail to perceive any abuse of discretion because he later reduced the time. The change was made after defense counsel told the court that he would doubt seriously that he will need to argue four hours. Defense counsel, on the day of argument, said he requested four hours "in an abundance of caution. I would think it would be more like two hours * * * but I don't think it will run up to four hours. I doubt that."

ty plea accepted. See *North Carolina* v. *Alford* (1970), 400 U.S. 25 [56 O.O.2d 85]. He contends, however, that the court abused its discretion in this case by refusing to accept the change of plea because the court permitted the jury to hear the presentation of endless cumulative evidence in proof of the crimes to which he admitted guilt. Such an evidentiary presentation, appellant argues, clouded the actual issue before the jury of whether Jenkins possessed specific intent to kill Anthony Johnson. Moreover, this required the court to instruct the jury on all of the admitted felonies, which appellant contends made the instructions very complicated and difficult for the jury to follow.

We are unpersuaded by appellant's arguments inasmuch as we believe the denial of the change of plea was due, at least in part, by the actions of defense counsel.

The timing of the request to change plea was probably the result of defense strategy. Counsel was aware of the overwhelming evidence of guilt on these charges long before trial and should reasonably have anticipated what he now claims is the prejudicial effect of having them all heard at trial. This motion could have been made earlier giving the state more time to consider the possible adverse effects of the change of plea. As it was not made earlier, however, the trial court was also required to consider the disadvantage of the prosecutor. The facts are not so one-sided as to constitute an abuse of discretion.

## XVII

Appellant next contends that written police reports prepared by state witnesses are discoverable at trial under Crim. R. 16. He submits that his cross-examination of the witnesses was prejudicially impaired when the court failed to conduct an *in camera* inspection of the documents to determine if the reports were subject to disclosure under Ohio's Criminal Rules.

Officers Howard and Henderson testified for the state on direct examination as to what they personally saw and heard upon arrival at the crime scene outside the bank. On cross-examination defense counsel ascertained that Howard had prepared a police report detailing his involvement with the arrest of the appellant and his accomplice.[54] At that point, the

---

[54] Defense counsel asked Officer Howard about any police reports as follows:

"Q. Patrolman Howard, in preparation for your testimony in court this morning, did you have occasion to read any reports that you prepared?

"A. No, I did not.

"Q. Did you prepare a police report on October 21st or any other day thereafter, detailing your involvement with this situation?

"A. Yes, I did.

"Q. And would this have been a Form 1 report?

"A. Correct.

"Q. Did you also have occasion to prepare a RC-1 report?

"A. No, I did not.

"Q. Did you have occasion to sign the Form 1 report?

"A. Yes, I did."

court asked the prosecutor to see "the statement." The prosecutor replied, "I do not have any written statement from this police officer. I merely have a police report." Defense counsel felt that the police report was a statement. However, he neither requested that anyone inspect it, nor that it be preserved for appellate review. Following similar direct and cross-examination of Henderson,[55] defense counsel asked the second officer whether his report included appellant's statement to him: "I shot him [Johnson] because he was going to shoot me." When the witness replied that it did, defense counsel made his sole request regarding Henderson's report:

"Judge, at this time I would ask the court to review the report of Officer Henderson, not because he used it to refresh his recollection, but to determine whether or not that in fact is in his report. If it is not in his report, it could be exculpatory in nature and we should be able to use this report to cross-examine *on this issue.*" (Emphasis added.)

The prosecutor then supplied the report to the judge, who read it and stated, "That is the same thing he testified to." The court then read that portion of the report into the record:

"This is the report signed by Gregory Henderson, 'Gregory Henderson: Why did you shoot him?' and Jenkins stated to him in reply, 'He did not want to get shot by the police.' "

The judge confirmed the date of the quoted report and asked defense counsel, "Anything further?" Defense counsel replied, "No, judge." Appellant made no further request or motion that anyone inspect the report and no request that the court preserve it for appellate review.

The appellant now contends that the police reports are discoverable statements under Crim. R. 16(B)(1)(g).[56] He argues that it was prejudicial error for the court not to conduct *in camera* inspections as provided for in the rule. Appellant further contends that his failure to request an inspec-

---

[55] When the state completed its direct examination of Officer Henderson, defense counsel asked him about his police report. The officer replied that he made, read, and signed the report on the day of the alleged offenses. He had "glanced at it a couple of times" since then. He had not reviewed it with the prosecutors or other police officers.

[56] Crim. R. 16(B)(1)(g) provides:

"Upon completion of a witness' direct examination at trial, the court on motion of the defendant shall conduct an in camera inspection of the witness' written or recorded statement with the defense attorney and prosecuting attorney present and participating, to determine the existence of inconsistencies, if any, between the testimony of such witness and the prior statement.

"If the court determines that inconsistencies exist, the statement shall be given to the defense attorney for use in cross-examination of the witness as to the inconsistencies.

"If the court determines that inconsistencies do not exist the statement shall not be given to the defense attorney and he shall not be permitted to cross-examine or comment thereon.

"Whenever the defense attorney is not given the entire statement, it shall be preserved in the records of the court to be made available to the appellate court in the event of an appeal."

tion was because of the court's tacit finding that the documents were non-discoverable at trial and that the absence of the reports from the record is excusable as it was the court's duty and not appellant's to see that the documents were available on appeal.

The state responds that no error occurred, as the two documents which defense counsel sought to examine were police reports, which are excluded from discovery requirements by Crim. R. 16(B)(2).[57] The state also contends that this issue was waived by the appellant because motions for *in camera* inspections were not made, a proper foundation was not laid concerning the existence of witness statements, and the documents were not preserved in the record for appellate review as is mandated by the Criminal Rules.

Clearly, a signed written statement of a state witness would serve the purpose of Crim. R. 16(B)(1)(g) and fall within the plain meaning of the word "statement," just as would a recording of the witness' words or a transcription thereof. We see no reason why the mere fact that the document was a report of a police officer would automatically bar its disclosure. When it is doubtful whether any discoverable statement exists, the court, on motion of the defendant, shall conduct a hearing on the issue of disclosure held *in camera* with both attorneys present and participating. *State* v. *Daniels* (1982), 1 Ohio St. 3d 69. See, also, *Palermo* v. *United States* (1959), 360 U.S. 343; *Fortenberry* v. *State* (1975), 55 Ala. App. 1, 312 So. 2d 573; *State* v. *Johnson* (1978), 62 Ohio App. 2d 31 [16 O.O.3d 74].

This is not to say that all portions of a police report are discoverable under Crim. R. 16(B)(1)(g). Reading this section *in pari materia*[58] with Crim. R. 16(B)(2), it becomes apparent that those portions of a testifying police officer's signed report concerning his observations and recollection of the events are "statements" within the meaning of Crim. R. 16(B)(1)(g). Those portions which recite matters beyond the witness' personal observations, such as notes regarding another witness' statement or the officer's investigative decisions, interpretations and interpolations, are privileged and excluded from discovery under Crim. R. 16(B)(2). Cf. *State* v. *Houston* (Iowa 1973), 209 N.W. 2d 42, 46. Hence, once it is determined that a report in which a producible out-of-court statement of the witness

---

[57] Crim. R. 16(B)(2) provides:

"Except as provided in subsections (B)(1)(a), (b), (d), (f), and (g), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal documents made by the prosecuting attorney or his agents in connection with the investigation or prosecution of the case, or of statements made by witnesses or prospective witnesses to state agents."

[58] There is a duty to construe all parts of a statute or rule *in pari materia* in order to give full effect to all provisions if it is reasonably possible to do so. Cf. *State, ex rel. O'Neil,* v. *Griffith* (1940), 136 Ohio St. 526 [17 O.O. 160]; *Warner* v. *Ohio Edison Co.* (1949), 152 Ohio St. 303 [40 O.O. 355].

being examined exists, the trial court, on motion of the defendant, must afford attorneys for all parties the opportunity to inspect the "statement" portions personally. *State* v. *Daniels, supra,* at 70-71.

However, in the case *sub judice* the court *sua sponte* asked the prosecutor to see Howard's report and not on defense counsel's motion. Subsequently, defense counsel merely asked the judge to review a portion of Henderson's report to ascertain if appellant's inculpatory statement therein was consistent with the officer's testimony. The judge complied with this request, indicated the statement was consistent with the testimony and read the appropriate portion of the report into the record. At that point the judge queried, "Anything further?" and defense counsel replied, "No judge."

At the time of the officers' examination, appellant knew that an *in camera* inspection had not been conducted and should have objected at that time, or otherwise moved the court to conduct such an inspection if he believed it was necessary to do so. In a situation such as this a defendant cannot be heard to complain on appeal about a matter which the trial judge could have remedied if the defense had complained then. *State* v. *Williams* (1977), 51 Ohio St. 2d 112 [5 O.O.3d 98], paragraph one of the syllabus; *State* v. *Graven* (1978), 54 Ohio St. 2d 114, 116 [8 O.O.3d 125]. Cf. *Engle* v. *Isaac* (1982), 456 U.S. 107; *Pittsburgh Plate Glass Co.* v. *United States* (1959), 360 U.S. 395, at 401.[59]

Lastly, this assignment of error must be overruled for a failure to comply with the last paragraph of Crim. R. 16(B)(1)(g). A copy of the statement was not "preserved" or included in the record as is mandated by the rule. The appellant has failed to demonstrate that he either requested this be done or objected in any manner to its omission. Neither report is before this court, and other than appellant's speculative conjecture, there is an absence of any showing of actual prejudice. See *Cleveland* v. *Austin* (1978), 55 Ohio App. 2d 215, 223-225 [9 O.O.3d 368]; *Fortenberry, supra,* at 3-4. Accordingly, we hold that the trial court did not err in ruling that these statements were not subject to disclosure under Crim. R. 16.

## XVIII

Appellant argues that he was denied a fair trial in that the trial court refused to compel testimony from a defense witness who had invoked his Fifth Amendment privilege against self-incrimination.

The defense witness, Lester Jordan, was indicted with the appellant for the identical charges. The court ordered separate trials, and the appellant was tried first. During the state's case, Officer Henderson testified

---

[59] In *United States* v. *Nobles* (1975), 422 U.S. 225, the Supreme Court stated that an order of the trial court requiring the defense to produce relevant portions of a defense investigator's report for the prosecution's use cannot be challenged on appeal by the appellant on grounds or issues that defense counsel failed to develop or urge at trial. *Id.* at 228, 229, and fn. 4.

he heard Jenkins tell Jordan that he shot Officer Johnson because he didn't want the police officer to kill him. Appellant subpoenaed Jordan as a defense witness to deny the conversation and to testify that appellant was then unconscious and unable to speak due to his injuries.

The court preliminarily advised defense counsel and Jordan's counsel that such testimony would constitute a waiver of Jordan's privilege against self-incrimination concerning the transaction of the testimony. The court then permitted the defense to conduct a *voir dire* examination of Jordan outside the jury's presence to determine whether he would invoke his privilege. After elicitation of his name and age, Jordan refused to answer any of defense counsel's inquiries concerning the events at the bank.[60]

Appellant contends that he was denied his right to compulsory process and to a fair trial in that the responses he sought to obtain from Jordan fall outside the witness' Fifth Amendment protections and would not involve a waiver to further inquiry on direct or cross-examination concerning the subject of his testimony.

The state submits that no error occurred, as the danger to the witness was real, appreciable and quite clear. The state contends that Jordan's answers to defense counsel's questions likely would have incriminated Jordan and left him vulnerable on cross-examination concerning the circumstances and details of the activity at the scene of the crime.

---

[60] Defense counsel's questioning of Jordan on direct examination was as follows:

"Q. Directing your attention to October 21st of last year, to the front of the National City Bank at around 9:40 in the morning, did you have occasion to be out there in the presence of Leonard Jenkins who was laying [*sic*] on the ground and a black police officer?

"A. I refuse to answer on the grounds that it may intend [*sic*] to incriminate me.

"Q. Did you ever hear Leonard Jenkins confess this crime to anybody?

"A. I still refuse to answer on the ground it may intend [*sic*] to incriminate me.

"MR. TITTLE: Judge, the last question, 'Did you ever hear Mr. Jenkins confess this crime to anybody,' that could in no way incriminate this witness.

"THE COURT: You have your exceptions.

"MR. TITTLE: I would ask the Court to order him to answer. It is not incriminating.

"THE COURT: You have your exceptions. The Court will not.

"Next question, please.

"MR. TITTLE: One second.

"BY MR. TITTLE:

"Q. From now on whatever question I ask you, are you going to try to take the Fifth Amendment?

"THE COURT: If you wish you may confer with your attorneys. Approach the witness, Mr. Keane or Mr. Carson [Jordan's counsel].

"(Thereupon, a discussion was had between the witness and his counsel, Mr. Thomas Keane, off the record.)

"A. I invoke the Fifth Amendment.

"Q. You take the Fifth Amendment?

"A. Yes.

"Q. You won't even answer that question?

"A. Right."

The Fifth Amendment to the United States Constitution, as does Section 10, Article I of the Ohio Constitution, declares that "[n]o person * * * shall be compelled in any criminal case to be a witness against himself * * *." This amendment "was added to the original Constitution in the conviction that too high a price may be paid even for the unhampered enforcement of the criminal law and that, in its attainment, other social objects of a free society should not be sacrificed." *Feldman* v. *United States* (1944), 322 U.S. 487, 489.

The provision is accorded liberal construction in favor of the right it was intended to secure, *Counselman* v. *Hitchcock* (1892), 142 U.S. 547, and affords protection not only to the accused but also to witnesses who may always claim as privileged that which tends to incriminate themselves. *Malloy* v. *Hogan* (1964), 378 U.S. 1; *In re Frye* (1951), 155 Ohio St. 345, 349 [44 O.O. 320].

Recently, in *United States* v. *Apfelbaum* (1980), 445 U.S. 115, 128, the Supreme Court stated that the question must pose " '* * * substantial and "real" and not merely trifling or imaginary, hazards of incrimination.' " The *Apfelbaum* decision, relied on heavily by appellant, appears to be of little additional value in the instant analysis as it concerned the issue of whether the testimony of a government witness, who had been granted statutory immunity, could be used in a subsequent trial for false swearing. Jordan was a defense witness, did not have immunity and did not testify. However, the *Apfelbaum* court did reaffirm its earlier pronouncements in *Rogers* v. *United States* (1951), 340 U.S. 367, and *Brown* v. *Walker* (1896), 161 U.S. 591, which provide, *inter alia,* that the right to decline answers to specific questions applies only when the danger of incrimination is real and appreciable, rather than imaginary and insubstantial. The witness may validly invoke this privilege whenever the answer could reasonably serve as a link in the chain of evidence against him. *Hoffman* v. *United States* (1951), 341 U.S. 479, 486-487.

If a witness refuses to answer a question, basing his refusal upon the reason that his answer would incriminate him, his belief is not always conclusive with respect to the incriminating character of the evidence sought to be elicited. Rather, a question is presented for the determination of the court to decide whether any direct answer may reasonably have a tendency to incriminate the witness or to furnish proof of an element or link in the chain of evidence necessary to convict him of a crime. If the answers clearly would not incriminate him, he may be required to answer. *Hoffman, supra; McGorray* v. *Sutter* (1909), 80 Ohio St. 400; *Hebebrand* v. *State* (1935), 129 Ohio St. 574, 580 [2 O.O. 562]; *Ex parte Irvine* (Cir. Ct. S.D. Ohio 1896), 74 F. 954; *United States* v. *DiCarlo* (N.D. Ohio 1952), 102 F. Supp. 597.

A witness may waive his personal privilege if he desires to do so. *Mimms* v. *State* (1866), 16 Ohio St. 221, 230-231. See, also, *Rogers, supra.* The privilege is not violated if he testifies without objection and it is in-

ferred that he did so voluntarily. *Lindsey* v. *State* (1903), 69 Ohio St. 215, 223; *Burke* v. *State* (1922), 104 Ohio St. 220.

The weight of authority supports the rule, followed by the courts below in the instant case, that a witness who has begun the account of a transaction will be compelled to complete the narrative. Courts will not allow a witness to state a fact and afterwards refuse to give the details or to answer legitimate questions pertaining to the initial statement. *Rogers, supra,* at 373-375; *Mimms, supra,* at 230-231; *Este* v. *Wilshire* (1887), 44 Ohio St. 636. A witness who testifies to the "transaction" cannot refuse to answer further questions relative to the matter on the ground that the answers will incriminate him. *Id.*[61]

As applied to the case *sub judice,* it is clear that the initial questions asked Jordan by defense counsel concerning his presence at the bank were incriminating in and of themselves. Additionally, they would tend to link Jordan to the "transaction" at the bank, and if answered by Jordan would have left him unprotected regarding further legitimate questions pertaining to his initial statements. The defense questions would reveal that Jordan knew the appellant, was present when the appellant was lying on the ground, was in a position to overhear any confession made by appellant, was at the arrest scene, and would have led to more explicit and detailed inquiry concerning his statements, thus comprising a real and substantial danger of further self-incrimination. The trial judge stated that "[o]nce the constitutional privilege is waived, the State has an opportunity to invade the entire — to inquire on the entire issue, the entire *transaction.*" (Emphasis added). It is apparent that the judge properly recognized the real and appreciable self-incrimination implications and did not err in refusing to compel Jordan's testimony concerning the privileged matter. We find no error in the trial court's refusal to compel witness Jordan's testimony over his invocation of his Fifth Amendment protection against self-incrimination. Likewise, we hold that Section 10, Article I of the Ohio Constitution provides protection for witnesses, such as Jordan, who may always claim as privileged that which tends to incriminate themselves. Accordingly, appellant's argument in this regard must be overruled.

## XIX

Appellant next contends that his inculpatory statement at the hospital emergency room was obtained by the police in disregard of his constitu-

---

[61] The Supreme Court in *Rogers, supra,* at 374, fn. 16, quotes an earlier Michigan decision with approval as follows:

" 'The case of the *ordinary witness* can hardly present any doubt. He may waive his privilege; this is conceded. He waives it by exercising his option of answering; this is conceded. Thus the only inquiry can be whether by *answering as to fact X, he waived it for fact Y.* If the two are related facts, parts of a whole fact forming a single relevant topic, then his waiver as to a part is a waiver as to the remaining parts; because the privilege exists for the sake of the incriminating fact as a whole.' (Emphasis in original.)"

tional rights against self-incrimination, and to counsel, and was involuntary due to his low intelligence combined with the surrounding circumstances.

The hospital staff testified that upon admission to the emergency room at 9:51 a.m. the appellant was "very shocking, cold, and clammy." Appellant suffered from a gunshot wound to his left chest and spinal cord. He was moaning in pain upon admission. Pain-killing drugs were not administered; however, a thorasic surgeon inserted a chest tube to relieve pressure from fluid build-up. Appellant's blood pressure was very low but began to rise after fluid was replaced intravenously. The attending physician, Dr. Mehir K. Datta, testified that at the time of admission to the emergency room, appellant's low blood pressure was due to blood loss, would result in decreased mental awareness, and that it was "quite possible that he could not understand questions * * *." An attending nurse stated that his blood pressure was much improved by 10:15 a.m. and was fluctuating between 60/40 at 10:30 a.m. and 100/60 at 11:00 a.m., and was more or less stable at 10:40 a.m.

When queried by the nurse, Judith Chase, at approximately 10:15 a.m., appellant gave her a fictitious name and was able to speak and to respond when asked to turn his body for an x-ray. He was also able to answer when asked to move his legs.

Detectives Michael J. Cummings, Leo Allen and Timothy Patton arrived at the emergency room at approximately 10:30 a.m. Cummings and Allen testified that they heard Patton advise appellant of his constitutional rights and also heard appellant's response that he understood his rights. The officers testified that he did not request a lawyer but did indicate he was willing to make a statement.

The officers testified that appellant appeared in some discomfort. Nevertheless, at the time of questioning, appellant, according to one of the officers, no longer appeared to be shaking, trembling or sweating. The officers went on to state that he was able to converse in a normal or low tone of voice. During this initial interrogation at the emergency room, which lasted anywhere from twenty to forty-five minutes, appellant made inculpatory statements that he had shot at the police because he did not want to get caught.

During this questioning, hospital staff were either attending or in view of the appellant at all times. Nurse Chase testified that she observed the police questioning appellant but that they were whispering and she did not hear the conversation's content.

Appellant's eventual demand to end the interrogation was honored by the police who terminated the questioning in the emergency room.

Appellant filed a pretrial motion to suppress the inculpatory emergency room statement, as it had not been obtained in conformity with *Miranda* v. *Arizona* (1966), 384 U.S. 436 [36 O.O.2d 237], and *State* v. *Kassow* (1971), 28 Ohio St. 2d 141 [57 O.O.2d 390], vacated in part on

other grounds (1972), 408 U.S. 939, nor in compliance with the due process voluntariness test under *Greenwald* v. *Wisconsin* (1968), 390 U.S. 519, 521, and *Lego* v. *Twomey* (1972), 404 U.S. 477. At the hearing on appellant's motion, appellant indicated that he had no recollection of the events in the emergency room.

As we stated in *State* v. *Buchholz* (1984), 11 Ohio St. 3d 24, 27: "The United States Supreme Court's decision in *Miranda* was designed to safeguard an individual's Fifth Amendment right against compulsory self-incrimination." An accused can waive his constitutional rights to silence and counsel if his election is made voluntarily, knowingly and intelligently. *Miranda, supra.*

"The merit of *Miranda*, as explained by Justice Blackmun in *Fare* v. *Michael C.* (1979), 442 U.S. 707, 718, is that the protections are neither one-sided nor designed strictly to benefit criminal defendants.

" '* * * *Miranda's* holding has the virtue of informing police and prosecutors with specificity as to what they may do in conducting custodial interrogation, and of informing courts under what circumstances statements obtained during such interrogation are not admissible. This gain in specificity, which benefits the accused and State alike, has been thought to outweigh the burdens that the decision in *Miranda* imposes on law enforcement agencies and the courts by requiring the suppression of trustworthy and highly probative evidence even though the confession might be voluntary under traditional Fifth Amendment analysis.' " *Buchholz, supra,* at 27.

This court held in *State* v. *Scott* (1980), 61 Ohio St. 2d 155 [15 O.O.3d 182], at paragraph one of the syllabus:

"An express written or oral statement of waiver of the right to remain silent or the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in *Miranda* v. *Arizona*, 384 U.S. 436 [36 O.O.2d 237]. (*North Carolina* v. *Butler,* 60 L. Ed. 2d 286, 292, followed.)"

In addition to the requirements of *Miranda,* due process provisions of the federal Constitution dictate that the state must meet by a preponderance of the evidence its burden of proving that any inculpatory statement was made voluntarily. *Lego, supra.* The court must determine whether the totality of the circumstances demonstrates that the statements are of the accused's free and rational choice. *Greenwald, supra.*

In a case heavily relied on by appellant in his brief, and not altogether unlike the case at bar, the United States Supreme Court provided considerable guidance for this due process query of voluntariness in *Mincey* v. *Arizona* (1978), 437 U.S. 385. *Mincey* provides that use at trial of an involuntary statement is a denial of due process and reversible error. To be

admissible, a confession must be the product of rational intellect and a free will.

In *Mincey,* as well as in the case. *sub judice,* both appellants suffered gunshot wounds in situations where a police officer died. Both appellants made inculpatory statements while in custody at a hospital after being taken to its emergency room. The Supreme Court in *Mincey* determined that the appellant was weakened by pain and shock, isolated from family and counsel, and was barely conscious at the time of the confession. In holding the confession involuntary, the Supreme Court closely considered all relevant facts surrounding the confession and cautioned that the determination of whether a statement is voluntary requires more than a mere color-matching of cases. It requires careful evaluation of all the circumstances of the interrogation. *Id.* at 401.

Comparison of the hospital setting in *Mincey* with a close examination of the setting in the case at bar reveals significant factual distinctions which must be evaluated to determine whether appellant knowingly waived his rights and made a voluntary statement. In *Mincey,* the accused was interrogated for four hours, during which time he continuously lapsed in and out of unconsciousness. Mincey repeatedly sought to terminate the questioning by invoking his right to counsel which was not honored by the police. Mincey was unable to talk and had to write his responses to the questions. Mincey complained of being confused or unable to think clearly and accurately and asked that the officer desist questioning until the next day. The court found that Mincey's statements were not the product of a rational intellect and a free will and held that the conviction could not stand.

In the case at bar, much of the untrustworthy indicia of *Mincey* are not present. Although both cases involve a wounded murder suspect's hospital statements, the circumstances of the interrogations are factually distinguishable. In the case *sub judice* the record reveals that the appellant's blood pressure was improving and was more or less stable at the time of questioning. The entire episode lasted no more than forty-five minutes during which the appellant was always conscious. Unlike Mincey, who could not then speak, testimony reveals that appellant could converse and did so in a normal voice. The state's witnesses indicated that appellant understood his rights and expressed a willingness to talk with the police. When appellant indicated he no longer wished to speak with the officers, the interrogation was promptly terminated. The facts do not reveal an indication of police coercion or abuse. Detective Allen testified that he received permission to interview appellant from a doctor at the hospital prior to the questioning. Although this conversation was apparently not otherwise confirmed at the suppression hearing, the surrounding facts demonstrate that the emergency room staff were aware of the police presence and questioning. Other than asking the officers to move at times so that appellant could be attended to, there is no suggestion that hospital

personnel warned that the interview was contra-indicated due to appellant's condition.

Appellant also contends that he lacked sufficient intelligence to understand his rights or the effect of a waiver. Appellant has a low I.Q. and his mother testified that he was in a "slow learner class" while attending junior high school. Citing the case of *Tague* v. *Louisiana* (1980), 444 U.S. 469, in support, appellant asserts that low intelligence precludes a knowing waiver absent proof contra by the state. Intelligence is undoubtedly one factor for a court to weigh when considering the voluntariness of an inculpatory statement. In *Tague,* however, the Supreme Court was faced with a situation where the police officer did not form an opinion as to whether the accused understood his rights nor even remembered for certain if he had even informed the accused of those rights. Faced with such a set of facts, the Supreme Court understandably held there was a lack of any evidence that the accused had been advised of or knowingly waived his rights. In the instant case, the police officers testified that they had indeed informed appellant of his rights and that he affirmatively responded he understood and waived those rights. Appellant's answers to the officer's questions appear responsive. Appellant correctly points out that the officers are not trained medical experts. However, based on their observations and conversations with the appellant they believed he did comprehend the effect of his waiver and the rights involved. While the explanation of rights and their waiver must be weighed with the individual's medical condition and mental capacity, the totality of the evidence supports the trial court's judgment to admit the statement in this case. *State* v. *Royster* (1976), 48 Ohio St. 2d 381, 387-389 [2 O.O.3d 489], vacated in part on other grounds (1978), 438 U.S. 911. See, also, *Boulden* v. *Holman* (C.A.5, 1967), 385 F. 2d 102, vacated in part on other grounds (1969), 394 U.S. 478; *United States* v. *White* (C.A.5, 1971), 451 F. 2d 696, certiorari denied (1972), 405 U.S. 998.

Resolution of this issue undeniably involves a close scrutiny of police conduct, appellant's condition (mental and physical), and the other attendant conditions. Our evaluation of the circumstances, however, reveals that the lower court's decision is not erroneous and that the government met its burden of proving the voluntariness of the confession. *Lego, supra.* Further, the evidence fully supports a finding that appellant knowingly and explicitly waived his constitutional rights under the Fifth and Sixth Amendments. When he did invoke his privilege, his right to terminate the interrogation was scrupulously honored. *Michigan* v. *Mosley* (1975), 423 U.S. 96. See, also, *Edwards* v. *Arizona* (1981), 451 U.S. 477.

## XX

Appellant claims that he was prejudiced by the trial judge's contact and discussions with the jury, in the absence of counsel and the court

reporter, during the interval of time following the verdict in the guilt phase of the bifurcated trial and prior to the penalty phase.[62]

During their actual deliberations in a capital case, jurors must be sequestered. R.C. 2945.33. Ohio's statutory framework for imposition of capital punishment neither mandates nor precludes sequestration of the jury following its guilty verdict, but prior to the penalty phase. However, in an effort to minimize the risk of jury contamination, the court herein directed that the jury remain under loose court supervision between the two trial segments. During this interval the jury was not receiving evidence or deliberating; however, the court believed certain communications could be prejudicial. The court transported the jurors to a resort motel in an adjoining county where bailiffs could monitor their activities. Their spouses and children could visit, and they could participate in various recreational activities. The trial judge also advised counsel that he would dine with the jurors on occasion to check the arrangements, help insure they were adhering to the court's instruction and assist jurors in resolving personal problems.[63] These arrangements were made with the knowledge and apparent consent of defense counsel. Prior to departing, the court admonished the jurors in the presence of defendant and all counsel that they should not discuss the case with anyone. He instructed them not to watch television, listen to the radio, or read newspapers. He further advised them: "If you have a serious personal problem, then you will bring that to my attention through the court people who will be with you to help you out and I will make my appearance at the hotel very frequently." His last words at this juncture were: "We are going to retire now. We will let you go to supper and I will join you with my wife. The Court stands adjourned." The defense expressed no objection to these comments which the judge made in open court.

After the jury had completed its responsibilities for the penalty phase, defense counsel filed a timely motion for a new trial. One ground for that motion asserted that the judge had "discussions with the jury in the absence of the court reporter." The court scheduled and conducted a post-trial hearing on appellant's new trial motion. The appellant did not call any witnesses at the hearing regarding this claim and the sole evidence

---

[62] When the jury returned its verdicts of guilt, the court scheduled the penalty phase to begin ten days later. This interim period was to afford appellant an opportunity to request and obtain a presentence investigation and a psychiatric examination pursuant to R.C. 2929.03(D)(1). Additionally, the court conducted hearings regarding proposed evidence and procedures for the penalty phase.

[63] The trial judge told counsel on the record:

"I myself, personally, intend to go out there every other day and give them instructions about their conduct, vis-a-vis, I will make it casual, meet them for lunch, you know, and get them all together and give them that instruction as to their conduct so that no one can say that we weren't strict enough with them."

consisted of defense counsel's affidavit in which he presented his personal knowledge of the trial judge's contact with the jury.[64]

The trial judge admitted at the hearing that he discussed problems concerning continued jury service with the jurors, and in one instance where a juror expressed concern as to continuing, the court apparently told him to have his children visit him at the motel. The trial judge went on to state that there was no communication between the jury and himself regarding the jury's deliberation, sentencing, the verdict, or the case in general.[65]

---

[64] The sole evidence submitted to support that branch of the new trial motion was an affidavit by defense counsel which stated in part:

"4. I was present, along with * * * [the prosecutor and other defense counsel] in the chambers of David T. Matia when Judge Matia admitted that he, not a bailiff or a clrk [sic] took the jurors to dinner at McCarvey's [sic] Restaurant in Vermillion, Ohio on or about March 31, 1982;

"5. I was also present on an [sic] date earlier in Judge Matia's chambers when he informed all present that he was going to the Aquamarine, where the jurors were sequestered, during the week between the end of the first trial and the commencement of the second trial;

"6. I did not object to this because I felt that the judge was not being entirely serious, and I felt that if the Court were going to reinstruct the jurors on anything that the court reporter would have been present;

"7. I had previously filed a motion to record all proceedings, which was granted, and I felt directed that all communications to jurors in this case would have been recorded."

[65] At the post-sentencing hearing the trial judge stated:

"Now, for your information, the so-called McGarvey supper was not during deliberations. It was in the so-called semi-sequestration where the jurors were kept away from the general public, but allowed to see their families, have their families physically there. They were allowed to talk with people in the hotel who they casually came upon but not about the case.

"Secondly, at that time [of] the so-called McGarvey's dinner, this Court said nothing whatsoever to them about this trial, what their verdicts should be or anything else of the sort except the standard warning and admonition, don't talk about the case, as was said by this Court 150 times vigorously. There was no communication, no written material, no impression of the Court of anything of the sort.

"There were communications from the jurors to the Court about personal problems. One juror had a problem because his two sons, apparently missed their dad, let's put it that way. One or two problems about when they can go back to work and the answer was the same answer as always given, I don't know."

Later in the hearing, the trial judge added:

"I have had sequestered jurors before, I remember vaguely, but I am not certain of the exact number, half a dozen or less cases, and every instance I had supper with my jurors. And in every instance that we had supper at the Bond Court of Hollenden House, there has not been a court reporter. The exact same format was followed in this matter.

"If you recall, gentlemen, our conversations in chambers about what the hell we are going to do with this jury over this long period of time and there was no objection from the State or the defense about the Court seeing those jurors and seeing how the set-up was going.

"* * * [In] [n]one of my prior sequestrations was there a court reporter, and in this case, as in those cases was there any communication of the Court about the case or verdict or anything else."

*Remmer* v. *United States* (1954), 347 U.S. 227, affords a presumption of prejudice as to private communication between the court and a juror about the matter pending before the jury. The Supreme Court explained at 229:

"In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial *about the matter pending before the jury is,* for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during trial, *with full knowledge of the parties.* The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." (Emphasis added.)

Here, however, there is no claim of any discussion related to the case itself, as in *Remmer,* and the court's statements at the new trial hearing negate any prejudice. Additionally, all parties had full knowledge of the contacts in advance as the judge announced his intention, without objection, prior to adjournment. More recently, the Supreme Court reexamined this subject in *Rushen* v. *Spain* (1983), \_\_\_\_ U.S. \_\_\_\_, 78 L. Ed. 2d 267. The *per curiam* opinion stated at 272-273: "We emphatically disagree * * * [with the appellate court's ruling that] an unrecorded *ex parte* communciation between trial judge and juror can never be harmless error * * *." *Rushen* supports both the necessity for a showing of prejudice and the position that a record is not required for all *ex parte* communications between the court and members of the jury.[66]

To prevail on a claim of prejudice due to an *ex parte* communication between judge and jury, the complaining party must first produce some

---

[66] In *Rushen,* a juror went to the judge's chambers on two occasions during the trial to express concern about information developed after jury empanelment. Trial evidence disclosed that the state's informant had been convicted of killing someone this juror knew. Although no reporter or counsel was present in the court's chamber, the judge reportedly asked whether the new evidence would affect her disposition of the case. She assured him that it would not, and he in turn told her not to be concerned.

The opinion reasons:

"In this spirit, we have previously noted that the Constitution 'does not require a new trial every time a juror has been placed in a potentially compromising situation * * * [because] it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.' *Smith* v. *Phillips,* 455 U.S. 209, 217 * * * (1982). There is scarcely a lengthy trial in which one or more jurors does not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial. The lower federal courts' conclusion that an unrecorded ex parte communication between trial judge and juror can never be harmless error ignores these day-to-day realities of courtroom life and undermines society's interest in the administration of criminal justice.

"This is not to say that ex parte communications between judge and juror are never of serious concern or that a federal court on habeas may never overturn a conviction for prejudice resulting from such communications. When an ex parte communication relates to some

evidence that a private contact, without full knowledge of the parties, occurred between the judge and jurors which involved substantive matters.

Obviously, the stage of the proceedings is also critical, as communications prior to verdict are more suspect. Yet, even then, some communications are harmless. See *State* v. *Abrams* (1974), 39 Ohio St. 2d 53 [68 O.O.2d 121] (trial judge offers to reread part of his original instructions to answer a jury question in defendant's absence, but jurors elect not to hear it).

As the court said in *Rushen,* "[p]ost-trial hearings are adequately tailored" to the task of determining the nature of any communications and resulting prejudice. *Id.* at 274. We further note that any party can compel court personnel or jurors to testify concerning "any improprieties of any officer of the Court" or "whether extraneous prejudicial information was improperly brought to the jury's attention." Evid. R. 606(B).

In this case, defense counsel sought to rest on the judge's admission that he dined with the jurors. This admission failed to supply a threshold showing of a substantive communication, bias, or prejudice in light of the judge's further explanations on the record at the hearing. Additionally, the trial record and defense counsel's own affidavit disclose that the court advised all parties of his intended actions. By making no complaint, defense counsel waived any objection, if he did not affirmatively acquiesce. Counsel cannot complain on appeal about supposed errors which he chose not to assert when they could have been remedied at trial. *State* v. *Williams, supra.* We therefore hold that the *ex parte* communication complained of herein was innocuous. The judge and jurors did not discuss any fact in controversy or any law applicable to the case. Appellant was not prejudiced by this innocent interaction between the judge and jurors and no constitutional rights have been deprived.

## XXI

In conclusion, based on the foregoing reasons, we uphold appellant's conviction and death sentence. As a testament to the gravity of sustaining a decision to impose the ultimate penalty, we have thoroughly examined and discussed each argument raised by appellant and, in fact, have agreed with appellant's arguments in certain respects. Nonetheless, we are completely satisfied that today's decision accomplishes the goal of all criminal cases — the fair and impartial administration of justice, *i.e.,* justice from both the accused's and society's perspectives.

Finally, no person is capable of completely putting aside the full range of emotions encountered when considering a capital case. We are com-

---

aspect of the trial, the trial judge generally should disclose the communication to counsel for all parties. The prejudicial effect of a failure to do so, however, can normally be determined by a post-trial hearing. The adequacy of any remedy is determined solely by its ability to mitigate constitutional error, if any, that has occurred. [Citations omitted]. Post-trial hearings are adequately tailored to this task. [Citations omitted.]" *Id.* at 273-274.

pletely satisfied in this respect also that today's decision represents, to the best of our abilities, an objective, impartial, and unprejudiced review of the conviction and sentence given to this appellant.

Accordingly, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

SWEENEY, LOCHER, C. BROWN and J. P. CELEBREZZE, JJ., concur.

W. BROWN and HOLMES, JJ., concur in the syllabus and judgment only.